COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Ortiz and Chaney
Argued at Lexington, Virginia


EDNA MICHELLE NAPIER

                                                        MEMORANDUM OPINION* BY
v.        Record No. 0518-21-3                          JUDGE DANIEL E. ORTIZ
                                                        MARCH 1, 2022

WISE COUNTY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF WISE COUNTY
Jeff Hamilton, Judge

Anna Maria Midence (Midence Law Firm PLLC, on brief), for
appellant.

(Jeremy B. O'Quinn; Jeffery Elkins, Guardian *ad litem* for the
minor children, on brief), for appellee.  Appellee and Guardian *ad
litem* submitting on brief.


Edna Michelle Napier ("mother") appeals the termination of her parental rights with

respect to her three children T.N., A.N., and K.N. (collectively "the children") by the Wise

County Circuit Court.  Mother makes four assignments of error on appeal, contending that:

(1) the circuit court erred in finding that the Wise County Department of Social Services ("the

Department") had strictly complied with the foster care plan under Code § 16.1-283(A) and

(C)(2); (2) the circuit court erred in not considering the effects of the COVID-19 pandemic and

the related Supreme Court of Virginia orders of judicial emergency when calculating the time

frame set by Code § 16.1-283(C)(2); (3) the circuit court erred in granting the termination

petitions where the Department did not satisfy its duty to pursue suitable relative placement; and

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(4) the circuit court erred in granting the termination petitions where mother had corrected all the reasons for the children's removal by the time of the circuit court hearing.[1] As the circuit court did not err as a matter of law, and the record contains evidence to support the court's judgment, we affirm the termination of mother's parental rights.

BACKGROUND[2]

Mother is the biological parent of T.N., A.N., and K.N., who are seventeen, eleven, and eight, respectively. The children were in the care of mother and their biological father Larry Napier ("father") until April 16, 2019. Prior to that time, T.N. and K.N. were residing with mother, and A.N. was residing with father, but neither parent had permanent housing. There were reports of domestic violence incidents by father towards mother which the children witnessed. Moreover, both parents had substance abuse issues. Specifically, mother tested

---

[1] This assignment of error functionally addresses the sufficiency of the evidence at the time of the circuit court hearing. Mother's own brief characterizes this assignment as follows:

> Napier asserts that the evidence is insufficient, as a matter of law, to support the termination of her residual parental rights; specifically that the trial court did not consider that she had substantially remedied the conditions which led to the removal of her children. . . . Napier argues that the trial court's decision, even when viewed in the light most favorable to the appellee, whether she had substantially remedied the conditions that led to the removal as required under Code of Virginia §16.1-283(C)(2), were not supported by clear and convincing evidence and must be reversed.

Opening Br. at 9. Thus, despite the dissent's contention otherwise, our analysis substantially addresses mother's fourth assignment of error.

[2] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues mother has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

positive for methamphetamine. The Department provided ongoing pre-removal services to both parents but determined in April 2019 that preventative measures were no longer effective. The Department then sought emergency removal of the children.

On April 16, 2019, the Department filed abuse and neglect petitions on behalf of the children, and the Wise County Juvenile & Domestic Relations District Court ("the JDR court") entered emergency removal orders. The reasons for removal included (1) domestic violence issues, (2) substance abuse by the parents, and (3) homelessness. Regarding housing, "neither parent had a home of their own for the children to reside in long term." On the date of removal, April 16, 2019, T.N. and K.N. were temporarily residing with their half-brother David Frith in Cumberland, Kentucky, while A.N. was residing with father. On April 25, 2019, nine days after removal, the Department held a family partnership meeting "to give the parents an opportunity to assist in the development of the service plan, inform them of their right to appeal, to present them with a list of community service providers, . . . and to initiate their visitation plan." Mother attended and participated in this first meeting.

The initial foster care plans ("initial plans"), filed on May 28, 2019, stated a program goal of "Return to Own Home" with a concurrent goal of "Relative Placement." The initial plans were approved by the JDR court on June 11, 2019. The target date listed on the initial plans was April 30, 2020.

The initial plans emphasized the important but attainable steps that the parents needed to take in order to achieve the program goal. These included addressing substance abuse issues, housing concerns, and domestic violence, improving parenting skills through therapy and classes, and cooperating with the Department and court orders. In an effort to attain these goals, the initial plans listed the services offered to the parents including parental home visits, drug screenings, substance abuse counseling, parenting classes and moral reconation therapy, referrals

for parenting assessments, referrals for psychological assessments, family counseling sessions, counseling for domestic violence victims, and scheduled visitation with the children. The Department provided all of these services and resources.

The initial plans likewise detailed the efforts made to locate and place the children with relatives: "[t]he agency conducted a database search through CLEAR[3] and any potential relatives were contacted by letter concerning the status of the child." Further, the initial plans noted that "[i]f any family members express an interest . . . [the Department] will utilize all home study guidelines to assess their suitability as a placement option." No family member responded to the letters or filed a petition for custody of the children.

Mother failed to attend the second family partnership meeting scheduled on September 12, 2019. Her boyfriend called to inform the Department they would not be able to attend because they were being forced to move out of their temporary residence. After the missed family partnership meeting, the Department filed the foster care review plans ("review plans") on September 17, 2019, which reiterated the program goal of "Return to Own Home" with a concurrent goal of "Relative Placement" and maintained the target date of April 30, 2020. The review plans stated that there was no significant change in progress since the initial foster care plans were approved.

The review plans also identified multiple substantial barriers to goal achievement that continued to exist. Mother tested positive for methamphetamine and other drugs in May, June, and August, and refused drug tests in June and July 2019. The Department was provided no proof that mother was involved in or had completed any of the programs outlined in the initial plans. As of the review plans' filing, the Department noted that mother stated on multiple occasions that she planned to enroll in counseling but provided no evidence that she had done so.

---

[3] CLEAR is the database used by Wise County to search for potential relatives of a child.

The Department noted that contact with mother had been sporadic and that she would need to enroll in classes to address the removal concerns.  Moreover, at the time of filing, mother was still homeless, having had to move out of her temporary housing.  In the review plans, the Department explicitly stated that "[i]f there are not any substantial changes in regards to progress prior to the permanency planning hearing, the agency will have to give serious consideration to an alternative goal at that time."

The Department noted that it held a third family partnership meeting on January 21, 2020, and "neither parent attended this meeting or called to explain their absence."  On January 28, 2020, the Department filed new foster care service plans ("final plans"), changing the program goal to adoption.  The new target date for achievement was December 31, 2020.  The reason stated for the new service plans was "Permanency Planning."  The final plans explained why "Return to Own Home" was not chosen as a goal:

> This goal was not chosen but was selected as the primary goal on the initial foster care plan.  Needs, services, and responsibilities were listed that, if followed, would have placed the family squarely on the path towards reunification.  The mother and father have both failed to properly address the removal issues or make the required progress that would make them an option for the children.  The time has now arrived for permanency planning and neither parent is in a position to have the children on a full time basis.  To place them back with either would pose significant risk of further abuse/neglect to the children.

The Department detailed its reasoning for why adoption was chosen as the new program goal:

> This goal was chosen based on the children's ages, the length of time they have been in care, and the fact that the higher priority goals have not been achieved.  Adoption will be in their best interest, provide them a safe, stable environment, and offer them an opportunity to make a permanent connection with a forever family.

Those final plans identified continuing barriers to goal achievement. Regarding housing, the final plans stated that although mother had recently obtained housing in Kentucky, the home had "no beds for the children or furniture in the other rooms outside of the mother's bedroom." The Department identified substance abuse as an ongoing concern as mother had only provided negative results in October 2019 and January 2020. Additionally, mother's boyfriend tested positive for Suboxone without a prescription in January 2020. The final plans reiterated that mother provided "zero proof" other than her assertions that she "[was] involved or completed any type of rehabilitative programs" listed in the foster care plans. Finally, the permanency plans noted that mother's contact with the Department had been sporadic, which made parenting assessments difficult. On January 28, 2020, the Department filed petitions for the termination of mother's parental rights to her three children ("termination petitions") pursuant to Code § 16.1-283.[4] The Department also filed petitions for permanency planning hearings on behalf of the children.

The JDR court held a termination hearing on February 18, 2020, which mother's attorney attended. The JDR court granted the termination petitions. Mother appealed the termination orders to the circuit court.

On April 13, 2021, the circuit court heard mother's appeal. At the outset of the hearing, the court conducted *in camera* interviews with the three children. The circuit court recited the children's *in camera* testimony on the record during its ruling. The older two children stated to

---

[4] The dissent interprets Code § 63.2-910.2(A) to mean that the Department was not required to file termination petitions until "a child has been in foster care . . . for 15 of the most recent 22 months" or if a parent has been convicted of a violent offense. However, the parties did not raise this argument and Code § 63.2-910.2(A) did not form the grounds for the termination petitions in this case. Most importantly, Title 16.1 outlines specific timelines for the Department to act at each stage of a parental rights termination case. *See* Code §§ 16.1-281(A), (C), -282(A), and -283(C). Reading Code § 63.2-910.2 to change those deadlines would render the time periods provided by Title 16.1 meaningless.

the trial judge that when they were with mother "they didn't bathe regularly, they didn't brush their teeth regularly. They didn't have regular food. They had excessive absentees in school." The oldest child told the judge that she was worried that if she went to school, no one would look after her brother. The judge noted that the children

> expressed more than an absolute joy with the idea that they're in a house now that's different than the house that they were in. An unbridled happiness to be somewhere other than they were located. To be treated something other than the way they were being treated.

At no point during the trial did either party object to the children's *in camera* testimony or raise the issue on appeal.

The circuit court heard testimony from Kimberly Carter, a licensed practical counselor for the children. Carter testified that she began working with the children in the spring of 2019 and sees them once or twice a month. Letters from Ms. Carter documenting her findings were admitted. She testified that the children all showed symptoms of post-traumatic stress when she began meeting with them. One of the children made an allegation of inappropriate touching by mother's current boyfriend, which Ms. Carter reported to the Department. Another child, K.N., was nonverbal when she began treating him. Ms. Carter testified that they had recovered substantially during treatment and were excited about their current foster family. She also testified that returning the children to mother would be "psychologically devastating for them."

In his statements to the court, the guardian *ad litem* provided similar observations of the children's significant progress in their education and well-being. Specifically, he noted improvement in school attendance and performance since the children had been placed with their foster family. Moreover, in argument, the guardian *ad litem* noted communications he had with the children, in which they discussed how happy and safe they felt at their foster home.

- 7 -

Paul Adams, the Department foster care worker assigned to the children in September 2019, testified next. In preparation for this case, Mr. Adams discovered that mother had a prior felony conviction for wanton endangerment of the eldest child from 2007. He also testified that the initial plans indicated CLEAR letters were sent to eligible relatives. Regarding mother's progress, Mr. Adams testified that mother completed a parenting class on October 21, 2019, but only completed moral reconation therapy on June 10, 2020—four months after the termination by the JDR court. Similarly, mother completed a psychological evaluation on June 2, 2020. Mr. Adams likewise testified that mother tested positive for controlled substances during the nine months following removal, and in February 2020 after the termination by the JDR court.[5] He stated that mother attended eleven of her supervised visitation appointments with the children and missed six others. Mr. Adams heard from mother that she had found acceptable housing just prior to the JDR court hearing but could not verify that it was fully equipped with utilities, food, water, and power.[6]

The circuit court then heard testimony from mother. Mother denied the allegation of physical abuse made by one of the children against her current boyfriend. She admitted to not finishing moral reconation therapy until after the termination by the JDR court. Further, mother testified that she obtained a lease in June 2020, four months after the initial termination. Mother admitted that the Department had discussed potential relatives for placement of the children with her and that she identified her son David Frith. At no point did mother offer an excuse or

---

[5] Mother tested positive for gabapentin, a controlled substance for which mother did not have a prescription.

[6] The dissent incorrectly interprets this decision's characterization of Mr. Adams' testimony. The testimony speaks for itself, and our interpretation is in line with the standard of review and gives deference to the prevailing party below.

explanation for missing the third family partnership meeting in which the goal for adoption was determined.

Finally, the court heard testimony from the children's half-brother David Frith, in which he articulated his desire to have custody of the children. Mr. Frith admitted that the Department told him three months prior to the circuit court hearing that he would need to file a custody petition if he wished to pursue custody. Mr. Frith declined to do so because he believed mother "deserved them back." Additionally, even after the JDR court terminated mother's parental rights, he was "waiting for the outcome" and "thought [mother] would get them back."

The circuit court terminated mother's parental rights as to all three children. In its ruling, the court found that termination was in the best interests of the children and that mother had failed to remedy substantially the conditions which led to the children's foster care placement within a reasonable period of time not to exceed twelve months from removal. Mother timely appealed the terminations.

ANALYSIS

"In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Farley v. Farley*, 9 Va. App. 326, 328 (1990). In assessing a circuit court's decision to terminate parental rights, "we view the evidence in the light most favorable to the prevailing party, in this case, the Department, and grant to it all reasonable inferences fairly deducible from the evidence." *King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 210 (2018) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 420-21 (2012)).[7] When reviewing a trial court's

---

[7] The dissent cites, but does not apply, the standard of review required in this case. In essence, much of the dissent's recitation views the facts in the light most favorable to mother, who did not prevail below, gives no deference to the circuit court as finder of fact, and omits key facts from its analysis.

decision to terminate parental rights, we presume a trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 7 (2005) (quoting *Farley*, 9 Va. App. at 329). We will not disturb a trial court's judgment based on evidence heard *ore tenus* "unless plainly wrong or without evidence to support it." *Id.* (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)).[8]

Appellate courts review a "circuit court's legal conclusions . . . *de novo*." *Lane v. Starke*, 279 Va. 686, 690 (2010). Likewise we "review interpretation of statutes . . . *de novo*." *Belew v. Commonwealth*, 284 Va. 173, 177 (2012).

## I. The circuit court did not err in finding the Department complied with the foster care plans under Code § 16.1-283(C)(2) and 16.1-283(A).

Mother's first assignment of error claims that the Department failed to comply with the foster care plans under Code § 16.1-283(C)(2) and Code § 16.1-283(A). In support of this assignment, mother argues that the Department was required to give her until the initial plans' goal target date of April 30, 2020 to remedy the causes of removal.

"The statutory scheme for the constitutionally valid termination of residual parental rights in this Commonwealth is primarily embodied in Code § 16.1-283." *Rader v. Montgomery Cnty. Dep't of Soc. Servs.*, 5 Va. App. 523, 526 (1988). The Supreme Court of Virginia held Code § 16.1-283 was constitutional and did not violate the Fifth and Fourteenth Amendments to the

---

[8] The dissent states that "[w]hen the sufficiency of the evidence depends on the interpretation of a statute, this Court 'review[s] the trial court's statutory interpretations and legal conclusions *de novo*.'" *Infra* at 31 (quoting *Sink v. Commonwealth*, 28 Va. App. 655, 658 (1998)). The full quote makes clear that a sufficiency of the evidence analysis is not a pure question of law: "Although the trial court's findings of historical fact are binding on appeal unless plainly wrong, we review the trial court's statutory interpretations and legal conclusions *de novo*." *Sink*, 28 Va. App. at 658. The case *JSR Mech., Inc. v. Aireco Supply, Inc.*, 291 Va. 377, 383 (2016), cited by the dissent, is focused on a court purely interpreting a statute, not a court applying a statute to facts.

U.S. Constitution, or Article I, §§ 1 and 11 of the Virginia Constitution. *Knox v. Lynchburg Div. of Soc. Servs.*, 223 Va. 213, 223 (1982).[9] Moreover, "due process requires the trial courts to comply strictly with the statutory scheme for disposition of child custody cases." *Rader*, 5 Va. App. at 528. Further, a natural parent "is entitled to prior and specific notice of the disposition sought by the agency in whose custody a child has been placed." *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 22 (1986).

Code § 16.1-283(A) reflects this entitlement, stating that "[n]o petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child." That provision also states that "[t]he court may hear and adjudicate a petition for termination of parental rights in the same proceeding in which the court has approved a foster care plan which documents that termination is in the best interests of the child." Code § 16.1-283(A).

Code § 16.1-281(A) sets forth the timeline in which the Department is required to prepare and file an initial foster care plan, requiring that the "department or child welfare agency shall file the plan with the juvenile and domestic relations district court within 45 days following the transfer of custody or the board's placement of the child" unless the court permits an extension. A hearing for the approval of the initial foster care plan must "be held within 60 days of . . . the original preliminary removal order hearing, if the child was placed in foster care pursuant to § 16.1-252." Code § 16.1-281(C). A foster care review hearing

> shall be held within four months of the dispositional hearing at
> which the foster care plan pursuant to § 16.1-281 was reviewed if
> the child . . . is under the legal custody of a local board of social
> services or a child welfare agency and has not had a petition to
> terminate parental rights granted, filed or ordered to be filed on the

---

[9] The Court ruled on the constitutionality of a prior, substantially similar version of Code § 16.1-283.

child's behalf; has not been placed in permanent foster care; or is age 16 or over and the plan for the child is not independent living.

Code § 16.1-282(A).  Moreover,

a permanency planning hearing shall be held within 10 months of the dispositional hearing at which the foster care plan pursuant to § 16.1-281 was reviewed if the child . . . is under the legal custody of a local board of social services or a child welfare agency and *has not had a petition to terminate parental rights filed on the child's behalf*, has not been placed in permanent foster care, or is age 16 or over and the plan for the child is not independent living.

Code § 16.1-282.1(A) (emphasis added).

Importantly, however, Code § 16.1-283(A) provides that "[t]he residual parental rights of a parent or parents may be terminated by the court as hereinafter provided in a separate proceeding if the petition specifically requests such relief."  Code § 16.1-283(C) provides a basis for termination if the court finds upon clear and convincing evidence that termination is in the best interests of the child and

[t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

That same section further provides that

[p]roof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan . . . shall constitute prima facie evidence of this condition.

Code § 16.1-283(C)(2).

In reviewing the Department's adherence to these requirements, we begin with the initial removal.  The children were removed because of abuse and neglect by their parents on April 16,

- 12 -

2019.[10] The Department filed the initial plans on May 28, 2019, which was forty-two days after the date of removal and within the forty-five-day period required by Code § 16.1-281(A). The initial plans were approved by the JDR court on June 11, 2019, which was fifty-six days after the date of removal and within the sixty-day period required by Code § 16.1-281(C). The review plans were filed on September 17, 2019, and approved on October 1, 2019, which was within the four-month period required by Code § 16.1-282(A). At no point did the Department miss any of the statutory deadlines.

The Department's next deadline was a permanency planning review hearing within ten months of the initial plans' dispositional hearing "if the child . . . is under the legal custody of a local board of social services or a child welfare agency and *has not had a petition to terminate parental rights filed on the child's behalf*." Code § 16.1-282.1(A) (emphasis added). However, the Department chose to file the termination petitions on January 28, 2020. Code § 16.1-282.1(A) clearly states a further permanency planning review hearing is only required within ten months of the initial plans' dispositional hearing if there have been no termination petitions filed on the child's behalf. As the Department filed new foster care plans and termination petitions on January 28, 2020 along with petitions for permanency planning hearings on the new goal of adoption, Code § 16.1-282.1(A)'s ten-month deadline from the initial plans was inapplicable.

---

[10] Despite the plain language of Code § 16.1-283(C)(2) providing that the period for a parent to substantially remedy conditions of removal is "not to exceed 12 months from the date the child was placed in foster care," the dissent faults the trial court for failing to analyze the second prong from the date of the circuit court hearing.

The dissent asserts that even though mother had a maximum of twelve months to remedy the conditions of removal *from the date the child was placed in foster care*, the court should instead look to whether she remedied the conditions as of the circuit court hearing—April 13, 2021—and consider "the totality of the circumstances." The dissent does not cite any precedent to support that claim. Instead, it rewrites the statute to permit mother almost twenty-four months to remedy the conditions of removal, with no regard to the best interests of the children, who were sitting in limbo.

- 13 -

Instead, the Department decided to pursue termination of mother's parental rights and

filed the termination petitions and final plans to that effect, pursuant to Code § 16.1-283(A).[11]

---

[11] Although raised by the dissent, mother did not argue that the children were never in foster care. Mother's own brief states that the children "were removed from the home of both parents in April 2019" and that "[u]pon placement of the children in foster care, the parents agreed to complete various services." Opening Br. at 5. In fact, mother asserts and the record contains evidence that the JDR court entered emergency removal orders, preliminary removal orders, and held adjudicatory abuse and neglect hearings. The dissent's reading of the factual record would likely be a surprise to mother, the Department, and most importantly the children, who are presently living with a foster family.

In *Rader*, this Court reversed a termination because no petition had been filed and no removal had taken place:

> On July 5, 1984, when the juvenile court apparently first became aware of the circumstances of the two Rader children in question, no petition seeking their custody by DSS had been filed. Code § 16.1-260, in pertinent part, requires the filing of a petition to invoke the jurisdiction of the juvenile court. Contrary to the position taken by DSS in this appeal, paragraph (F) of Code § 16.1-260 does not waive the requirement of the filing of a petition but, rather, addresses the duties of the intake officer and the actions taken in regard to the petition. *The juvenile court did not exercise its jurisdiction for emergency removal of the children pursuant to Code §§ 16.1-251 to 253. Under these statutes, the parents would have been given specific notice in writing of a subsequent hearing on the merits by a petition stating the factual circumstances which allegedly necessitated removal of the children.* In summary, the juvenile court did not have jurisdiction to enter the original custody order on July 5, 1984; consequently, the order was void.

*Rader*, 5 Va. App. at 527 (emphasis added) (footnote omitted). Unlike in that case, here the JDR court entered emergency removal orders and preliminary removal orders pursuant to Code §§ 16.1-251 and 16.1-252, respectively. The *Rader* case clearly contemplates such removal orders to be "commitment orders" under Code § 16.1-283.

The dissent misconstrues *Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465 (2008), for the proposition that a preliminary removal order is not a commitment order for purposes of termination. *See infra* at 41. Under that logic, no temporary order could ever be a commitment order prior to a termination, because a court could not award permanent custody to the Department while the parent's parental rights were still intact. Such a construction essentially writes "commitment order" out of the statute. Moreover, *Cook* does state that

- 14 -

Code § 16.1-283(A) further authorizes the court to "hear and adjudicate a petition for termination of parental rights in the same proceeding in which the court has approved a foster care plan which documents that termination is in the best interests of the child."

Moreover, mother had notice of the grounds for termination and the termination hearing. She received court-appointed counsel ahead of the JDR court hearing. In fact, mother failed to appear at both the second and third family partnership meetings, where the Department developed both the review plans, which warned of the possibility that the target goal would be changed, and the final plans, which changed the target goal to adoption.[12]

Finally, contrary to mother's argument, the circuit court was not required to find that mother failed or had been unable to make substantial progress "under and within the time limits or goal set forth in a foster care plan filed with the court." The pertinent text of Code § 16.1-283(C)(2) instead provides a basis for termination of parental rights if the parents fail to substantially remedy the conditions that led to removal and permits the Department to use the parent's failure to make substantial progress towards eliminating the removal conditions as

> A juvenile and domestic relations district court may also order the removal of an allegedly abused or neglected child by entering a preliminary removal order under Code § 16.1-252(A). The party petitioning for removal must prove the same facts as required for an emergency removal order. Code § 16.1-252(E). Following the preliminary removal hearing, the juvenile and domestic relations district court may place the child in the custody of a suitable agency or of a suitable person under the supervision of the local department of social services. Code § 16.1-252(F).

*Cook*, 276 Va. at 478.

[12] The dissent claims that this was insufficient notice of the disposition sought, even though the disposition sought—termination under Code § 16.1-283—was listed on the petitions and mother was appointed counsel. The dissent's analysis requiring specific grounds to be stated on a termination petition was not raised by mother at any point in this appeal, changes the word "disposition" from *Martin*, 3 Va. App. at 22, to "grounds for termination," and is not mandated by the statute.

- 15 -

*prima facie* evidence of the condition. Code § 16.1-283(C)(2).[13] Critically, this section sets forth

what "shall constitute prima facie evidence" but does not alter the underlying statutory basis for

termination. *See Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 539 (1990)

(holding that while Code § 16.1-283(B)(2)(c) provides certain situations that may constitute

*prima facie* evidence for termination, "the statute does not condition such a finding upon this

evidence alone"). Providing that certain proof may constitute *prima facie* evidence does not

change the legal framework for termination and does not impose an additional requirement on

the Department.

Thus, the circuit court did not err in its legal interpretation of the statutory termination

framework in finding that the Department had complied with Code § 16.1-283(A) and (C)(2).

II. The circuit court did not err in not considering the effects of the COVID-19 pandemic on the time frame set forth in Code § 16.1-283(C)(2).

Mother's second assignment of error asserts that the circuit court erred in not considering

the effects of the COVID-19 judicial emergency on the time frame established by Code

§ 16.1-283(C)(2) for mother to remedy substantially the conditions which led to the children's

removal.

As set forth above, Code § 16.1-283(C)(2) provides a basis for termination where a

parent has failed to remedy substantially the conditions requiring removal "within a reasonable

period of time not to exceed 12 months from the date the child was placed in foster care . . . ."

"The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an

---

[13] The dissent objects to our use of "fails" and would prefer we use "unwilling or unable" even though we cite verbatim the language of the statute in this opinion. In so doing, the dissent argues we are changing the words of the statute. However, it is unclear how a parent could be willing and able to complete a task and still fail to accomplish it. Conversely it is unclear how a parent who fails to complete a task would not be either unwilling or unable to accomplish it. If a parent is unwilling or unable to remedy the conditions of removal, they fail to do so. Manifestation of a parent's willingness and ability can only be shown by actual evidence of a parent's actions.

indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 56 (2003). Thus, the basis for termination is whether the parent has remedied substantially the conditions of removal within a "reasonable period of time" from the removal. The phrase "not to exceed 12 months" only operates as the outer limit of that time period.

This Court addressed the similar phrase "within a reasonable time" in the context of a termination under Code § 16.1-283(B)(2)(c). "The phrase, 'within a reasonable time' is not definable by any prescribed rule. Its meaning depends upon the context and the attendant circumstances; not upon mere opinion or expectation." *Kaywood*, 10 Va. App. at 540 (citing *Va. Ass'n of Ins. Agents v. Commonwealth*, 187 Va. 574, 579 (1948)).

The Courts' interpretations in *Kaywood* and *Va. Ass'n of Ins. Agents* are equally applicable to Code § 16.1-283(C)(2). The phrase "reasonable period of time" is not definable by any prescribed rule, and its meaning necessarily depends upon the context and attendant circumstances of the case. As such, the "reasonable period of time" is not a single rigid period of time set by statute. Rather, the reasonableness is a factual determination made by the circuit court.

In this case, the Department filed the termination petitions on January 28, 2020. The factual question before the circuit court was whether the period of time between removal and filing of the termination petitions—approximately nine and a half months—was a reasonable

- 17 -

period of time.[14]  The COVID-19 orders mother cites are not legally relevant to this determination, since the first declaration of judicial emergency by the Supreme Court of Virginia was issued on March 16, 2020, almost two months after the termination petitions were filed.  *See* March 16, 2020 Order Declaring a Judicial Emergency in Response to COVID-19 Emergency. For purposes of this case, the "reasonable period of time" for mother to remedy the causes of removal had already been determined by the time the COVID-19 emergency occurred. Therefore, the circuit court did not err in not considering the effects of the COVID-19 pandemic on the time frame set by Code § 16.1-283(C)(2).

III.  <u>The circuit court did not err in finding the Department satisfied the relative placement requirement found in Code § 16.1-283(A).</u>

Mother's next assignment of error asserts that the circuit court erred in finding the Department satisfied Code § 16.1-283(A)'s relative placement obligation.

Code § 16.1-283(A) requires that prior to terminating parental rights, a court "give consideration to granting custody to a person with a legitimate interest."  "Before termination of parental rights by the court, the agency seeking termination has an affirmative duty to investigate all reasonable options for placement with immediate relatives."  *Sauer v. Franklin Cnty. Dep't of*

---

[14] The dissent takes issue with our analysis of the reasonable period of time using the date on which the termination petitions were filed as the end date of the period.

First, whether one uses the filing date or the JDR hearing date is practically immaterial under this assignment of error, as both occurred prior to the COVID-19 judicial emergency. Second, Code § 16.1-283(A) provides that "No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child."  It necessarily follows that the basis for termination must exist at the time of the filing of the termination petitions.  Thus, the reasonable period of time must have already elapsed by the time the petitions were filed in order to form the basis for the termination petitions.  Under the dissent's logic that the only relevant consideration is the parent's status at the circuit court hearing, a department could file a termination petition before a reasonable period of time lapsed. Third, the dissent believes we are empowering the Department to determine the period of time a parent has to comply.  Rather, we reiterate that the JDR or circuit court is empowered under the statute to deny the termination petition if a department prematurely files a petition before a reasonable period of time has expired.

*Soc. Servs.*, 18 Va. App. 769, 771 (1994). However, this Court has held that this obligation is limited. In fact, the "statutory prerequisite is satisfied when the relative testifies before the circuit court, so that it may consider the suitability of placing the child with that relative, as compared with other placement options." *Desper v. Shenandoah Valley Dep't of Soc. Servs.*, No. 0634-18-3, slip op. at 8 (Va. Ct. App. Aug. 7, 2018). This Court has repeatedly found the statutory prerequisite is met for relative placement when a relative testifies at the circuit court hearing so that the court can assess the suitability of the relative for placement. *See, e.g.,¸ Brown v. Spotsylvania Dep't of Soc. Servs.*, 43 Va. App. 205, 218 (2004); *Hawthorne v. Smyth Cnty. Dep't of Soc. Servs.*, 33 Va. App. 130, 139 (2000). Moreover, "[n]othing in the statute or case law suggests that [the Department] has an affirmative duty to conduct a home study." *Brown*, 43 Va. App. at 217-18.

Although the dissent's reading of these opinions differs, these cases, combined with the standard of review, can only compel the conclusion a trial court can make decisions about a relative placement option after hearing the relative's testimony *ore tenus*. In *Hawthorne*, the full and complete quote from the opinion regarding relative placement is

> DSS did not similarly investigate Brown. *However, the purpose underlying Code § 16.1-283(A) was nevertheless met in this case.* The statute requires that the court "give a consideration to granting custody to relatives of the child" prior to terminating parental rights and placing the child in the custody of social services. Brown testified at the *ore tenus* hearing as to her suitability and willingness to assume custody of B.H. *Thus, as required by statute, the trial court was presented with evidence for its consideration as to the suitability of placing B.H. with Brown before it ordered the termination of appellants' parental rights.* It is well established in Virginia that a court will not compel "a vain and useless undertaking." Because Brown testified as to her suitability to assume custody of B.H., there was no reason to require DSS to investigate her, as the court had before it all the evidence necessary to consider Brown as a possible custodian.

*Hawthorne*, 33 Va. App. at 139 (emphasis added) (internal citation omitted). And again, in

*Brown*, the Court found that where a relative testifies and the trial court is presented with the

evidence for its consideration of suitability of the relative through that testimony, the statutory

requirement is met:

> Moreover, Rosemary testified at the hearing and informed the
> court of her "suitability and willingness" to take D.B. into her
> custody. The trial court also heard evidence from an expert, Ann
> Henley, who had evaluated "the family history of the children and
> the parents." Based on her evaluation, Henley concluded that D.B.
> had no attachment to, or bond with, Rosemary. She determined
> that Rosemary last saw D.B. when he was ten months old. She
> further concluded that placing D.B. with Rosemary would separate
> him from his sister, H., "the only constant in D.B.'s whole
> existence." "Thus, as required by statute, the trial court was
> presented with evidence for its consideration as to the suitability of
> placing [D.B.] with [Rosemary] before it ordered the termination
> of appellant['s] parental rights." Based on the evidence the trial
> court received, we cannot say that its decision to deny Rosemary's
> petition for custody of D.B. was plainly wrong.

*Brown*, 43 Va. App. at 218-19 (citations omitted).

Moreover, in *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 568

(2018) (emphasis added) (internal citation omitted), the Court cited all of the things that the

Department did and then stated the following:

> Ultimately, however, the circuit court had the responsibility of
> assessing this information and determining whether any relatives
> would be appropriate placements for the children. The record
> likewise indicates that the circuit court carefully considered the
> evidence of DFS's investigation into the relatives for placement,
> *including trial testimony from several potential relatives*, before
> concluding that none of the relatives would be suitable placements.
>
> The circuit court thus had ample evidence to consider and in fact
> gave full consideration to that evidence. Because this Court defers
> to a lower court's judgment based on evidence heard *ore tenus*
> unless plainly wrong or without support, it does not disturb the
> circuit court's ruling that no relatives were suitable placements.

While this case does not stand for the proposition that testimony alone satisfies the obligation under the statute, it does not reject it either, and does give substantial weight to the trial testimony of the potential relative. In fact, *Castillo* addresses facts similar to this case—a search for relatives occurred, letters were sent out to potential relatives, *and* a potential relative testified.

In cases where relatives testify, relatives are providing the court with an opportunity to assess their credibility and make determinations about suitability. As such, when a relative testifies, the circuit court has that testimony in front of them to make its decision about suitable relative placement.

In order to reach the conclusion asserted by the dissent, we would have to conclude that Mr. Frith, though he testified about his willingness and suitability to take the children, did not provide the circuit court with sufficient information to make that decision. Yet, the dissent would have us rely on that same testimony to find that "the record shows that Mr. Frith is a potential relative placement." *See infra* at 53. The dissent cannot have it both ways—Mr. Frith cannot testify that he is suitable and willing to take the children and simultaneously claim the circuit court does not have enough information about him to reach any conclusion on that issue. The absence of evidence and the existence of evidence are mutually exclusive.

Mother relies heavily on the *Sauer* case for the proposition that the Department had a duty to investigate Mr. Frith and that he did not have a duty to present himself as a relative placement option. In particular, the *Sauer* decision notes that the fact that "the grandmother did not present herself to the Department or the trial court as an alternative placement for the children to the termination of Mr. Sauer's parental rights is not material." *Sauer*, 18 Va. App. at 772.

However, the *Sauer* case is not the end of the analysis. Mother is correct that the Department had a duty to investigate potential relative placement. Yet following *Sauer*, in which

- 21 -

the relative at issue did not appear, this Court found in numerous cases that the duty was satisfied when the potential relative *appears* and testifies in circuit court—even if the relative does not have a duty to do so. Those cases are not in conflict. When that relative is able to testify and present his or her case for suitability, subject to cross-examination, the fact finder can make an informed determination and give "consideration to granting custody to a person with a legitimate interest." Code § 16.1-283(A).

In this case, unlike *Sauer* and like *Castillo*, the record contained evidence that the Department conducted a CLEAR record search for potential relatives for placement and sent out letters to those relatives in addition to the testimony of Mr. Frith. Further, the Department discussed potential relative placement options *with mother*.[15] Mr. Frith himself testified that the Department contacted him and told him that he needed to file a custody petition if he wanted custody of the children, yet he did not do so. He further testified regarding his suitability to take custody of the children. Mr. Frith stated to the circuit court that he chose not to seek custody of the children because he believed mother "deserved them back." Mr. Frith also claimed, after the JDR court's termination, that he "was waiting for the outcome" of the circuit court termination case.

There is ample evidence in the record to support the conclusion that the Department conducted a search for suitable relatives and attempted to contact them. The Department spoke with mother about alternative placement with relatives. The Department informed Mr. Frith about the need to petition for custody if he wanted the children. Most importantly, Mr. Frith himself testified, was cross-examined, and was questioned by the circuit court. This testimony alone is sufficient to satisfy the Department's duty under the applicable standard of review.

---

[15] The dissent does not adequately acknowledge the evidence in the record that letters were sent out to family members through the CLEAR system and that DSS asked mother about potential relatives for placement.

Beyond that, the record demonstrates the Department made efforts to investigate all reasonable options for placement with immediate relatives.[16] The *Brown* case makes clear the Department was not required to conduct a home study in order to meet its obligation. Thus, the circuit court did not err in finding the Department complied with Code § 16.1-283(A)'s relative placement obligation.

IV. <u>The circuit court did not err in granting the termination petitions pursuant to Code § 16.1-283(C)(2).</u>

Mother's final assignment of error asserts that the circuit court erred in granting the termination petitions.

Under Code § 16.1-283(C)(2), the court must determine (1) whether termination is in the child's best interests[17] and (2) whether the parent substantially remedied the conditions that led to the child's placement in foster care within a reasonable period of time, not to exceed twelve months. *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 169 (2014).

Under the first prong,

> the circuit court must evaluate and consider many factors: the age and physical and mental condition of the child; the age and physical and mental condition of the parent; the relationship existing between the parent and the child; the needs of the child; the role the parent has played, and will play in the future, in the upbringing and care of the child; and any other such factors that are necessary.

*Id.*

---

[16] The dissent does not address this additional evidence and testimony from Mr. Frith. This omission ignores the evidence the trial court necessarily considered in making its determination.

[17] The dissent is missing any meaningful discussion of the best interests of the children. Instead, it conducts an analysis not tethered to the statutory framework and prioritizing the interests of mother. The dissent disregards the interests that the termination procedure is designed to protect—those of the children.

If the circuit court finds clear and convincing evidence that termination is in the child's best interests, then the circuit court reviews the second prong. *Id.* at 170.[18]

Under the second prong of Code § 16.1-283(C)(2), the court must find clear and convincing evidence that

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2); *see also Thach*, 63 Va. App. at 170.

The time limit provided by subsection (C)(2) "does not . . . temporally restrict the trial court's consideration to events that occurred between the parent and child only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates." *L.G.*, 41 Va. App. at 57. Moreover, this Court held that

> [s]uch a construction of the statute "would deny the fact finder the opportunity to evaluate the *present* best interests of the child. The trial court may discount the parent's current 'progress' if the best interests of the child would be served by termination. However, . . . the trial court may determine that a parent's delayed, but nonetheless substantial, progress may overcome the time delay. We will not deprive the trial court of the opportunity to weigh the rights of the parents and the best interests of the child."

*Id.* (quoting *Roanoke City Dep't of Soc. Servs. v. Heide*, 35 Va. App. 328, 337 (2001)).

Thus, the circuit court's first determination is whether termination is in the best interests of the children and that inquiry is not constrained to the "reasonable period of time" provided in

---

[18] The dissent takes issue with the order in which this opinion analyzes the prongs of Code § 16.1-283(C)(2), even though the order is set out in the statute and in numerous cases, including the published case cited here. This criticism is logically flawed and functionally irrelevant—if either prong is not met, termination does not proceed *no matter the order*. Nonetheless we defer to the order set out in the statute and in case law.

Code § 16.1-283(C)(2). In this way, the first prong of the analysis functions as a backstop for

the parent—if progress is made after the "reasonable period of time" the court can consider such

evidence in determining the best interests of the child. If the circuit court then concludes that

termination is not in the child's best interests, the analysis does not continue to the second prong,

and the termination does not take place. Conversely, if the court finds it is in the best interests of

the child to terminate parental rights, the analysis moves to the second prong. Then, the question

is whether the parent substantially remedied the conditions that led to the child's placement in

foster care within a reasonable period of time, not to exceed twelve months. Code

§ 16.1-283(C)(2). At that point, any progress made after the "reasonable period of time" is

necessarily not a consideration under that prong of the analysis.

The dissent cites from *Rocka v. Roanoke Cnty. Dep't of Pub. Welfare*, 215 Va. 515

(1975), for the proposition that, irrespective of the statutory framework, we should hold that

termination should not be granted if the parent is completely fit at the time of the hearing. In

support of this position, the dissent specifically states "a fit parent with a suitable home has a

right to the custody of his child superior to the rights of others." *Id.* at 518.

The dissent partially quotes the Supreme Court of Virginia in *Harris v. Lynchburg Div. of

Soc. Servs.*, 223 Va. 235, 240-41 (1982): "The General Assembly's enactment of Code

§ 16.1-283 eliminated the necessity for an explicit finding of parental unfitness in parental

termination proceedings because a finding that the proof requirements of Code § 16.1-283 are

met 'is tantamount to a finding of parental unfitness.'" *See infra* at 33. The full quote from the

Supreme Court is:

> Citing our 1975 decision in *Rocka v. Roanoke Co. Dep't of
> Welfare*, 215 Va. 515, Harris and Woodson both contend that their
> residual parental rights cannot be terminated absent a specific
> finding of parental unfitness. They say the trial court made no
> such finding with respect to either parent, but merely found the
> existence of the factors listed in § 16.1-283(C)(2). Nothing in this

- 25 -

> new Code section, Harris and Woodson maintain, alters the *Rocka*
> requirement.
>
> We disagree. In a related case decided today, we held that the
> enactment of § 16.1-283(C)(2) eliminated the necessity for a
> specific finding of parental unfitness in termination proceedings
> between parents and social agencies. A finding that the factors
> listed in § 16.1-283(C)(2) exist, we said, is tantamount to a finding
> of parental unfitness.

*Harris*, 223 Va. at 240-41. Thus, in the very case cited by the dissent, the Supreme Court of Virginia addressed—and rejected—the argument that a specific finding of parental unfitness was required to terminate parental rights.

In this case, there was sufficient evidence to support the circuit court's decision to terminate mother's parental rights. Regarding the first prong of the statute, the circuit court detailed why it believed termination would be in the best interests of the children. In doing so, it properly considered the periods *before and after* the children's removal. The court referred to statements by the older two children *in camera*, where they related experiences in the home before removal. The children stated they did not bathe regularly, did not brush their teeth regularly, and did not have regular access to food. They also said they had excessive absentees in school, and the older children felt required to stay home and care for their younger brother. The guardian *ad litem* stated the children wanted to remain with their foster family and that their grades and well-being had improved. The children's therapist reiterated the children's initial condition and the progress they made in their foster home. She testified that returning the children to mother would be "psychologically devastating for them." Further, the circuit court cited mother's substance abuse issues, ongoing treatment, and failed drug test around the time of the JDR court termination hearing. The court reiterated that the children and guardian *ad litem* expressed that the prior placement was not a safe place and the children did not feel loved. Importantly, each of these factual considerations demonstrates that the court considered all of the

events before and after the reasonable period of time and reviewed the whole record for the best interests of the children. The record supports the court's finding of clear and convincing evidence that termination was in the best interests of the children as of the date of the circuit court's hearing.[19]

Likewise, the circuit court had sufficient evidence to conclude that there was clear and convincing evidence that mother failed to remedy substantially the conditions that led to the children's removal within a reasonable period of time not to exceed twelve months. As discussed above, the reasonable period of time relevant to the court's analysis was the period of approximately nine and a half months between removal on April 16, 2019 and the filing of the termination petitions on January 28, 2020.

In its ruling, the circuit court addressed the reasonable period of time under the facts and circumstances of this case:

> I am not belittling mom's situation, being in the home life that they were in. But that ended two years ago and she had 10 months to do something. And they're even pushing to move those up, but the idea about 12 months is we don't want to drag these cases to where 16 months later they're asking me why is it still going on. . . . And in that 10 months up to then, it just hadn't taken place.

The circuit court made a factual finding that mother's efforts "kicked into gear about four months after the termination decision" in the JDR court. Mother missed more than one third of her available visitation with the children during the nine and a half months after removal. She tested positive for methamphetamine and Suboxone throughout that period of time. Mother did not complete the moral reconation therapy until June 10, 2020 and only completed a psychological evaluation on June 2, 2020, approximately four and a half months after the

---

[19] The dissent ignores the majority of facts in the record regarding the condition of the children at the time of the circuit court hearing and claims we do not consider facts after the initial nine-and-a-half-month period. As evidenced by the facts cited in this paragraph, that claim is not accurate.

termination petitions were filed. Regarding housing, the assigned social worker, Mr. Adams, testified that he heard from mother that she had found an acceptable apartment prior to the JDR court hearing but could not verify that it was fully equipped with utilities, food, water, and power. The permanency plans filed in January 2020 noted that there was no furniture in the apartment outside of mother's bedroom. Mother's lease only had a start date of June 2020. Finally, while mother claimed she was making progress in the months leading up to the termination, she failed to attend, let alone participate in, both the second or third family partnership meetings. There was sufficient evidence for the circuit court to conclude that mother had failed to remedy the causes of the children's removal within a reasonable period of time not to exceed twelve months. As such, the circuit court did not err in granting the termination petitions.

## CONCLUSION

The circuit court did not err as a matter of law in terminating mother's parental rights with respect to the three children, and there was sufficient evidence in the record to support the court's factual findings. Therefore, the decision of the circuit court is affirmed.

*Affirmed.*

Chaney, J., dissenting.

Our law recognizes parents' fundamental liberty interest in the care, custody, companionship, and management of their children. Unfortunately, this case involves an unlawful and unnecessary judicial termination of mother's parental rights despite undisputed, unimpeached, and unrefuted evidence that mother was not currently unfit to provide proper care and custody of her children. Furthermore, the involuntary termination of mother's parental rights is unlawful because the Department failed to fulfill its affirmative statutory duty under Code § 16.1-283(A) to investigate and consider placement of the children with their adult brother. Because the circuit court's foundational factual findings are without evidence to support them and errors of law undermine the court's judgments, I would reverse the orders terminating mother's parental rights and order that custody of the children be restored to their mother. I therefore respectfully dissent.

> I. The Involuntary Termination of Mother's Parental Rights Is Unlawful Because Mother Was Not *Currently Unfit* to Provide Proper Care and Custody When Her Parental Rights Were Terminated in the Circuit Court.

The circuit court erred in terminating mother's parental rights because the evidence, taken in the light most favorable to the Department, failed to prove that mother was currently unfit to provide proper care and custody for her children.

Mother appealed to this Court to address the following assignment of error:

> The Circuit Court erred when it granted the termination petitions although the mother, Edna Napier, had corrected all of the reasons which led to the removal of her children and had a suitable place to live with all utilities and furnishings; therefore, the children could

have returned home with her on the day of the Circuit Court
hearing.

Br. of Appellant at 1 (fourth assignment of error).[20]

I conclude that the circuit court erred as a matter of law in granting the petitions for

termination of mother's parental rights when mother had remedied all the conditions of parental

unfitness that led to the removal of her children.

### A.  Standard of Review

The trial court's judgment based on evidence heard *ore tenus* will not be set aside unless

it is plainly wrong or without evidence to support it.  *See Fauquier Cnty. Dep't of Soc. Servs. v.*

*Ridgeway*, 59 Va. App. 185, 190 (2011); Code § 8.01-680.

Although the trier of fact determines the weight of the evidence and the credibility of the

witnesses, the trial court "may not arbitrarily disregard uncontradicted evidence of unimpeached

witnesses which is not inherently incredible and not inconsistent with facts in the record."

*Cheatham v. Gregory*, 227 Va. 1, 4 (1984); *see also Hankerson v. Moody*, 229 Va. 270, 274-75

(1985) ("A court may not base its findings on a suspicion which is contrary to the undisputed

positive testimony.").

---

[20] The majority does not directly address mother's fourth assignment of error. Consequently, the majority does not determine whether the circuit court erred by terminating mother's parental rights when—at the time of the termination hearing in the circuit court—mother had remedied the conditions of parental unfitness that led to the removal of her children. Instead, the majority considers whether the evidence is sufficient to prove the factors required for involuntary termination of mother's parental rights under Code § 16.1-283(C)(2).  To the extent that the majority's discussion of Code § 16.1-283(C)(2) addresses issues that were not raised in the assignments of error, the majority's analysis and conclusions are not part of its holding and amount to dicta.  "[A]ssignments of error set analytical boundaries for the arguments on appeal, provide a contextual backdrop for [the appellate court's] ultimate ruling, and demark the . . . border between holdings and dicta."  *Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of Am.*, 293 Va. 113, 123 (2017).  Because the majority's analysis includes a construction and application of § 16.1-283(C)(2), I address this issue in section IV of this dissent.

In an appeal from orders terminating parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court. *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018). However, this does not mean that we may ignore unimpeached, unrefuted, not inherently incredible evidence supporting mother's position which is not inconsistent with the other evidence. *See Cheatham*, 227 Va. at 5.

The issue of whether the circuit court erred in its application of Code § 16.1-283(C)(2) is a question of statutory interpretation, which is a pure question of law that we review *de novo*. *See JSR Mech., Inc. v. Aireco Supply, Inc.*, 291 Va. 377, 383 (2016). When the sufficiency of the evidence depends on the interpretation of a statute, this Court "review[s] the trial court's statutory interpretations and legal conclusions *de novo*." *Sink v. Commonwealth*, 28 Va. App. 655, 658 (1998).

### B. Proof of Current Parental Unfitness is a Prerequisite to the Constitutional Termination of Parental Rights.

The fundamental bond between parents and their children is of utmost constitutional significance. The Due Process Clause of the Fourteenth Amendment guarantees a parent's liberty interest in "the companionship, care, custody and management of his or her children." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This fundamental liberty interest of parents "does not evaporate simply because they have not been model parents or have lost temporary custody . . . to the State." *Richmond Dep't of Soc. Servs. v. Crawley*, 47 Va. App. 572, 581 (2006) (quoting *Santosky*, 455 U.S. at 753). "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 U.S. at 753.

"The termination of parental rights is a grave, drastic, and irreversible action." *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34-35 (2007) (quoting *Lowe v. Dep't of Pub. Welfare of the City of Richmond*, 231 Va. 277, 280 (1986)). When a court orders the

termination of parental rights, the parent is divested of all legal relations to the child "and the parent has no legal right to even communicate [with] or visit that child." *Id.* at 34. "[T]he ties between the parent and child are severed forever, and the parent becomes 'a legal stranger to the child.'" *Lowe*, 231 Va. at 280 (quoting *Shank v. Dep't of Social Services*, 217 Va. 506, 509 (1976)).

"While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare." *Tackett v. Arlington Cty. Dep't of Hum. Servs.*, 62 Va. App. 296, 320 (2013) (quoting *Lowe*, 231 Va. at 280 (quoting *Weaver v. Roanoke Dep't of Human Res.*, 220 Va. 921, 926 (1980))).

Under the Due Process Clause, the lawful termination of parental rights requires proof by clear and convincing evidence that the parent "is *currently unfit* to provide proper care and custody for the child as defined by state [parental termination] statutes." *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 275 (2005) (alteration in original) (emphasis added) (quoting David J. Herring, *Inclusion of the Reasonable Efforts Requirement in Termination of Parental Rights Statutes: Punishing the Child for the Failures of the State Child Welfare System*, 54 U. Pitt. L. Rev. 139, 168 (1992)); *see also Wright v. Alexandria Div. of Soc. Servs.*, 16 Va. App. 821, 829 (1993) ("Before a state may sever completely and irrevocably the rights of a parent in his or her natural child, due process requires that the state support its *allegations of parental unfitness* by at least clear and convincing evidence." (emphasis added)); *Farrell v. Warren Cty. Dep't of Soc. Servs.*, 59 Va. App. 342, 347 (2012) ("[R]egardless of what subsection of Code § 16.1-283 the Department proceeds under, it must prove each of its allegations by clear and convincing evidence before the JDR court [or circuit court] may terminate a parent's parental rights to his or her child." (citing *Santosky*, 455 U.S. at 747-48)).

"A fit parent with a suitable home has a right to the custody of his child superior to the rights of others." *Rocka v. Roanoke Cty. Dep't of Pub. Welfare*, 215 Va. 515, 518 (1975); s*ee also Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44-45 (2014). "The burden was not on [the mother] to prove her fitness; the burden was on the Department to prove [the mother's] unfitness before the trial court could take the ultimate, drastic, and irrevocable step of permanently terminating her parental rights." *Berrien v. Greene Cty. Dep't of Pub. Welfare*, 216 Va. 241, 244 (1975).

The General Assembly's enactment of Code § 16.1-283 eliminated the necessity for an explicit finding of parental unfitness in parental termination proceedings because a finding that the proof requirements of Code § 16.1-283 are met "is tantamount to a finding of parental unfitness." *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 241 (1982) (citing *Knox v. Lynchburg Div. of Soc. Servs.*, 223 Va. 213, 220 (1982)). In enacting statutory parental fitness factors, the General Assembly did not intend to abridge parents' constitutional rights. *See In re Phillips*, 265 Va. 81, 85-86 (2003) ("[A]ll acts of the General Assembly are presumed to be constitutional."). Because the General Assembly is presumed to have knowledge of constitutional requirements recognized in binding caselaw, the proof requirements of Code § 16.1-283 must be construed as including an *implicit finding* that the parent is currently unfit to provide proper care and custody.[21] This narrowing construction of Code § 16.1-283 is necessary to accord with the legislative intent to preserve the constitutionality of Code § 16.1-283. *See, e.g., Virginia Soc. for Hum. Life, Inc. v. Caldwell*, 256 Va. 151, 157 (1998). Code § 16.1-283 must be construed to give effect to the legislative intent to comply with constitutional

---

[21] When the parental unfitness factors in Code § 16.1-283(C)(2) are construed in accord with constitutional due process requirements, the evidence here is insufficient to support the involuntary termination of mother's parental rights under Code § 16.1-283(C)(2). *See infra*, section IV.

requirements and to preserve parent-child relationships. *See Bristol*, 64 Va. App. at 45 ("Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship." (citing *Richmond Dep't of Soc. Servs. v. L.P.*, 35 Va. App. 573, 580 (2001))).

### C. Mother Was Not Currently Unfit When the Circuit Court Terminated Her Parental Rights.

The evidence in the circuit court, taken in the light most favorable to the Department, did not support a finding that mother was *currently unfit* to provide proper care and custody of her children because she had remedied all the conditions of parental unfitness that led to the removal of her children. I agree with the majority that the record establishes that three conditions of parental unfitness led to the children's removal: (1) the children's exposure to their father's domestic violence against mother; (2) both parents' substance abuse; and (3) both parents' homelessness.[22] *See* Br. of Appellant at 24. But when viewing the evidence in the light most favorable to the Department, the undisputed, unimpeached, and unrefuted evidence establishes that mother had remedied these three conditions of parental unfitness at the time of the circuit court termination hearing.

### i. The Condition of Father's Domestic Violence

Mother remedied the condition of her husband's domestic violence by permanently leaving him just before the Department removed the children. *See* Br. of Appellant at 26. When mother finally decided to leave her abusive husband, he took A.N. away with him. Mother called the police to protect A.N., which prompted the involvement of the Department.

The record reflects that mother was the victim of her husband's frequent and brutal domestic violence throughout their sixteen-year marriage. Tragically, the children lived in fear

---

[22] The majority identifies these same three conditions as "[t]he reasons for removal." No other conditions of parental unfitness are alleged.

of their father, having observed his daily physical abuse of their mother. The father was the sole cause of the domestic violence condition. As the circuit court found, "everybody's evidence here is that mom was with a bad guy who treated her badly." The children reported that their father regularly hit mother and often knocked her to the ground. The children also witnessed their father threaten and try to kill mother. A.N.'s counselor reported that A.N. "constantly worries if her Mother is okay."

Additionally, there was evidence that father also physically abused the children. K.N. reported that his father hit him with belts. A.N. reported that her father hit her in the eye with a bottle when he threw the bottle at mother and missed. After the children were removed, their counselor reported that all three children showed symptoms of post-traumatic stress.

Mother remedied the condition of her husband's domestic violence by permanently separating from him. The undisputed, unimpeached, and unrefuted evidence establishes that mother was continuously separated from her abusive husband from April 2019 to April 2021, the date of the circuit court termination hearing. Consequently, the children's reunification with mother would not expose them to father's domestic violence.

Therefore, because no reasonable fact-finder can find that the condition of father's prior domestic violence existed at the time of the circuit court termination hearing, mother's parental rights cannot lawfully be terminated based on this condition.

### ii. The Condition of Substance Abuse

The evidence, taken in the light most favorable to the Department, fails to prove that mother abused any drugs within the twelve months preceding the circuit court termination hearing.

Mother began taking prescribed pain pills after suffering broken ribs in a car accident years ago. Mother also suffered chronic pain from her husband's prolonged physical abuse.

- 35 -

Eventually mother became addicted to opiates and developed a habit of abusing prescribed medications and illicit substances.

Mother remedied the condition of substance abuse by March 2020. The evidence established that mother completely abstained from substance abuse for the twelve consecutive months preceding the circuit court termination hearing in April 2021.

The undisputed, unimpeached, and unrefuted evidence of mother's abstinence from substance abuse was presented in the direct testimony of Paul Adams, the Department's caseworker. *See* Br. of Appellant at 26. Mr. Adams testified that on October 2, 2019, the JDR court directed that mother could have "no visits if she tested positive on drug screens. And then it was after that, that she made the change on her drug screens." Mr. Adams further testified as follows:

> [Department:]  Q[:]  "[S]ince January of 2020, has she failed any drug screens for you?"
>
> [Mr. Adams:]  A[:]  "She did on 2/25/2020. She tested positive for suboxone with a prescription. She tested positive also for gabapentin."[23]

Mr. Adams testified that mother was participating in a Suboxone clinic. Mr. Adams also testified that of twenty drug screens, mother had "7 failed drug screens, and all the failed drug screens were mostly in the beginning."

> [Department:]  Q[:]  "So 20 you gave her, and she's only failed one since January of 2020?"
>
> [Mr. Adams:]  A[:]  "That's correct."

---

[23] Gabapentin is an anti-convulsant—not an opiate nor opioid. The Department's Exhibit 4 records a positive gabapentin result as "anti-convulsant confirmation," and includes a chart showing that gabapentin is not classified as an opiate nor opioid. *See* Code § 54.1-3454 (classifying gabapentin as a Schedule V substance); *see also* Code §§ 54.1-3446 and 54.1-3488 (classifying opium and opiates as Schedule I and II substances).

Given mother's sustained recovery, no reasonable fact-finder could find that the condition of substance abuse still existed as a current condition of parental unfitness at the time of the circuit court termination hearing. Therefore, the circuit court could not lawfully terminate mother's parental rights based on this condition.

### iii. *The Condition of Homelessness*

The evidence, taken in the light most favorable to the Department, proved that mother had stable and suitable housing for herself and her children at the time of the circuit court termination hearing.

Mother financially depended on her abusive husband, and she became temporarily homeless after separating from him. Mother testified that she had remained with her abusive husband because she was scared and "had nowhere else to go." Mother explained, "I never left this man for sixteen years, because I depended on this man. I knew without this man, I was going to be homeless, and that's exactly what happened when I left that man."

Without her husband's financial support, mother struggled to obtain and maintain housing after the children were removed. By June 2019, mother was living in her car. Mother subsequently worked briefly as a live-in housekeeper. When mother was again displaced from housing, she stayed in her car for another two weeks until she could stay with a former neighbor.

By January 9, 2020, mother had substantially remedied the homelessness condition. Mother had moved to Cumberland, Kentucky, where her adult son, David Frith, resided with her grandson, L.F. Mother secured an apartment and a job and felt safe there.

Mother notified the Department about her new home, and Mr. Adams inspected her home on January 9, 2020. In addition to his in-court testimony, the record shows that Mr. Adams memorialized his personal observations of mother's home in the foster care service plan reviews filed on January 28, 2020. Mr. Adams recorded that on January 9, 2020, mother's home was

"adequate in size and condition" but will "need to be completed" with beds and furniture for the children. Mr. Adams made no report of any deficiencies regarding utilities, food, water, and power, as would have been his duty to report had he observed any such deficiencies.[24] There is no evidence to support an inference that in January 2020, mother was unable or unwilling to "complete" her home with necessary furnishings, as she did soon after Mr. Adams' January 2020 home visit. Mr. Adams subsequently visited mother's apartment in Kentucky several times. Mr. Adams testified that this three-bedroom apartment was always neat and clean and, more importantly, "[t]hat apartment was appropriate for the kids." *See* Br. of Appellant at 25.

In June 2020, mother moved from Kentucky back to Wise County, Virginia, where she still resided at the time of the circuit court termination hearing in April 2021. *See* Br. of Appellant at 26. Mother's Wise County home was a four-bedroom, three-bathroom house equipped with power and water. Every bedroom was fully furnished, providing each of the children with their own bedroom. The undisputed, unimpeached, and unrefuted evidence establishes that at the time of the termination hearing in the circuit court in April 2021, mother had a suitable home where her children could reside with her. Because mother's prior homelessness was not a current condition of parental unfitness at the time of the termination hearing, the circuit court could not lawfully terminate mother's parental rights based on the condition of homelessness.

---

[24] The majority's opinion asserts that Mr. Adams testified that he "could not verify that [mother's apartment] was fully equipped with utilities, food, water, and power." On direct examination, Mr. Adams was asked, "Did she have utilities and food and power, water?" Mr. Adams answered, "I'm not sure what she had on generally the 9th in her home, but it was progress." Given that Mr. Adams personally inspected mother's home on January 9, this testimony does not support an inference that Mr. Adams could not verify that mother's apartment was fully equipped with utilities, food, water, and power. In any case, based on his multiple home visits after January 9, 2020, Mr. Adams testified, "[t]hat apartment was appropriate for the kids."

*iv. No Current Conditions of Parental Unfitness*

Taking the evidence in the light most favorable to the Department, no reasonable fact-finder could find that any of the three alleged conditions of parental unfitness existed at the time of the circuit court termination hearing. Therefore, no reasonable fact-finder could find that the conditions that led to the children's removal rendered mother *currently unfit* to provide proper care and custody of her children. Given that current parental unfitness is a prerequisite to the lawful, constitutionally permitted termination of parental rights, the circuit court unlawfully terminated mother's parental rights under Code § 16.1-283(C)(2).

Therefore, I would reverse the orders terminating mother's parental rights and order that custody of the three children be restored to their mother.

## II. Mother's Parental Rights to Three of Her Children were Terminated in Violation of Due Process Requirements.

In addition to the reversible error identified in mother's fourth assignment of error, addressed above in section I, mother's first assignment of error also identifies grounds for reversing the circuit court's orders. Mother's first assignment of error alleges that the circuit court erred in finding that the Department "had strictly complied with the foster care plan as required by law in regards to the target completion date listed in all three permanency plans." In addressing this assignment of error, I agree with the majority that it is necessary to consider broadly whether the Department's actions strictly complied with the "statutory scheme for the constitutionally valid termination of residual parental rights . . . embodied in Code § 16.1-283."[25] *Rader v. Montgomery Cnty. Dep't of Soc. Servs.*, 5 Va. App. 523, 526 (1988). As noted by the

---

[25] "'Residual parental rights and responsibilities' means all rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship of the person, including but not limited to the right of visitation, consent to adoption, the right to determine religious affiliation and the responsibility for support." Code § 16.1-228.

- 39 -

majority, "due process requires the trial court to comply strictly with the statutory scheme for disposition of child custody cases." *Id.*

The majority is correct to consider whether the Department strictly complied with the statutory timelines that direct the Department in preparing and filing petitions and plans. However, I disagree with the majority's conclusion that "the circuit court did not err in its legal interpretation of the statutory termination framework in finding that the Department had complied with Code § 16.1-283(A) and (C)(2)." I conclude that the Department failed to comply with the statutory requirements for filing the petitions for the involuntary termination of mother's parental rights.[26]

On January 28, 2020, the Department filed three petitions to terminate mother's residual parental rights under Code § 16.1-283.[27] Code § 16.1-283(C)(2), the basis of the termination orders in this case, is only applicable when the child at issue is placed in foster care "as a result of (i) court commitment, (ii) an entrustment agreement entered into by the parent or parents, or (iii) other voluntary relinquishment by the parent or parents." None of these three preconditions for the lawful application of Code § 16.1-283(C)(2) was present here. *See Rader*, 5 Va. App. at

---

[26] In violation of the due process requirement for fundamentally fair procedures, the Department's termination petitions failed to give mother notice of the alleged grounds for the involuntary termination of her parental rights. The petitions contain no specific allegations and merely reference Code § 16.1-283, not the subsection(s) under which the Department sought termination. *See, e.g., In re S.M.H.*, 160 S.W.3d 355, 366 (Mo. 2005) (*en banc*) ("Due process requires that [t]he petition in a termination of parental rights case should contain allegations likely to inform those persons involved of the charges . . ." (quoting *In the Interest of H.R.R.*, 945 S.W.2d 85, 88 (Mo. App. W.D. 1997))).

[27] The Department filed petitions to involuntarily terminate mother's parental rights approximately nine months after the removal of the children. However, Code § 63.2-910.2(A) does not require the filing of termination petitions until "a child has been in foster care . . . for 15 of the most recent 22 months" or if the parent has been convicted of murder or other listed violent offense. There is no statutory requirement for filing termination petitions when the child is in the care of a relative or when termination of parental rights would not be in the child's best interests, as when "a relative has shown the will and ability to care for the child." Code § 63.2-910.2(A).

528 (holding that the circuit court's jurisdictional authority to terminate parental rights under Code § 16.1-283(C) requires a prior entrustment agreement or other voluntary relinquishment of custody by the parent, or a valid commitment order transferring custody to the department).[28]

In this case, there was no agreement between mother and the Department for mother's voluntary relinquishment of the children, and mother timely revoked her entrustment agreement.[29] Therefore, the Department's termination petitions under Code § 16.1-283(C)(2) were not properly filed unless an order of commitment was previously entered for each child.

The record does not show that any commitment orders were entered in this case. The emergency removal orders entered on April 16, 2019 did not constitute commitment orders. Rather, the emergency removal orders merely gave the Department *temporary* custody of the children, pending the adjudicatory and dispositional hearings on the abuse or neglect allegations. *See Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465, 472 (2008) ("an emergency removal order under Code § 16.1-251 transfer[s] *temporary* custody of [the child] to the [Department]").

Nor did the emergency removal orders "place the children in foster care" for purposes of Code § 16.1-283(C)(2). Pursuant to the emergency removal orders, all three children were "taken into immediate custody and placed in *shelter care*."[30] Code § 16.1-251(A). The General

---

[28] This Court explained in *Rader* that a commitment order transferring custody to the department is not valid without the prior filing of a petition to transfer custody unless the jurisdiction of the JDR court was invoked pursuant to Code § 16.1-251 to -253. *See Rader*, 5 Va. App. at 526-28.

[29] Both parents signed an entrustment agreement on October 26, 2020, but mother timely revoked her agreement on November 2, 2020. *See* Code § 63.2-1223 ("A valid entrustment agreement terminating all parental rights and responsibilities to the child shall be revocable by either of the birth parents until . . . seven days have elapsed from the date of execution of the agreement.").

[30] "'Shelter care' means the temporary care of children in physically unrestricting facilities." Code § 16.1-228.

Assembly has distinguished *shelter care placement* from *foster care placement*,[31] defining the latter as "placement of a child through (i) an agreement between the parents or guardians and the local board where legal custody remains with the parents or guardians or (ii) an entrustment or commitment of the child to the local board or licensed child-placing agency."  Code § 63.2-100. Accordingly, Code § 16.1-283(C)(2) only applies in cases involving "a child placed in foster care as a result of (i) court commitment, (ii) an entrustment agreement entered into by the parent or parents, or (iii) other voluntary relinquishment by the parent or parents."  Although the children were receiving "foster care services," this does not mean that the children were in a "foster care placement" because "foster care services" includes "services *to prevent* or eliminate the need for foster care placement."  Code § 16.1-228 (emphasis added).

The record does not show that the JDR court entered any commitment orders before the Department filed petitions to terminate mother's residual parental rights on January 28, 2020. The procedural history includes the following record events:  After the removal of the children, preliminary removal orders were entered on April 22, 2019, confirming the Department as the children's temporary legal custodian.  *See Cook*, 276 Va. at 472 ("a preliminary removal order under Code § 16.1-252 confirm[s] the [Department] as [the child's] temporary legal custodian"). On May 21, 2019, at the adjudicatory hearing, the JDR court found that the children were abused or neglected as defined in Code § 16.1-228.  Subsequently, on May 28, 2019, the Department filed the initial foster care service plans, with the concurrent goals of "return to own home" and "relative placement."  On June 11, 2019, at the dispositional hearing, the court had the

---

[31] The references in the foster care service plans to "placement in approved foster home" do not have the same meaning as "foster care placement" as defined in Code § 63.2-100.

- 42 -

opportunity to enter commitment orders for each child.[32]  *See* Code § 16.1-278.2(A)(5).

However, the record does not show that the court entered any commitment orders transferring

custody of any of the children to the Department.[33]  Instead, the court merely approved the

Department's initial foster care service plans filed on May 28, 2019, with concurrent goals of

"return to own home" and "relative placement."  Additionally, the plans gave mother a target

date of April 30, 2020 to achieve the plans' goals.

The Department filed the second set of foster care service plans on September 17, 2019.

The second set of foster care service plans again recommended the concurrent goals of "return to

own home" and "relative placement."  On October 1, 2019, the JDR court reviewed the new

foster care service plans and entered foster care review orders keeping April 30, 2020 as the

target date for mother's goal achievement.  At the October 2019 foster care review hearing, the

JDR court also set a permanency planning hearing for February 18, 2020.[34]

The JDR court had no authority to hold a permanency planning hearing on February 18,

2020.  The permanency planning statute, Code § 16.1-282.1, provides:

---

[32] If the JDR court had entered commitment orders on June 11, 2019, transferring custody of each child to the Department, then June 11, 2019 would be the date the children were "placed in foster care."  The maximum twelve-month period for remediation efforts pursuant to Code § 16.1-283(C)(2) would then begin on June 11, 2019 and end on June 11, 2020.  Prior to June 11, 2020, mother remedied all the conditions of removal, participated in a psychological evaluation, and completed the foster care plans' prescribed parenting classes and therapy classes.

[33] The Department adopted and incorporated mother's statement of the procedural facts, including the fact that the JDR dispositional hearing on June 11, 2019 resulted only in the court's approval of the initial foster care plans.  *See* Br. of Appellant at 2-3; Br. of Appellee at 1.

[34] It is unclear from the record whether the Department filed petitions for permanency planning before or after the October 1, 2019 review hearing—or whether the Department filed permanency planning petitions at all—because the permanency planning petitions for each child are undated, unsigned by the petitioner, unsigned by the intake officer, and bear no JDR clerk's "filed" stamp.  This is significant given that Code § 16.1-282.1 requires that the Department "shall file a petition for a permanency planning hearing 30 days prior to the date of the permanency planning hearing scheduled by the court."

> A permanency planning hearing shall be held within 10 months of the dispositional hearing at which the foster care plan pursuant to § 16.1-281 was reviewed *if the child (a) was placed through an agreement* between the parents or guardians and the local board of social services where legal custody remains with the parents or guardians and such agreement has not been dissolved by court order; *or (b) is under the legal custody of a local board of social services or a child welfare agency* and has not had a petition to terminate parental rights filed on the child's behalf, has not been placed in permanent foster care, or is age 16 or over and the plan for the child is not independent living.

(Emphasis added). The plain language of Code § 16.1-282.1 states that the prerequisites for permanency planning include the child being placed with the local board of social services pursuant to an agreement (plus additional specified circumstances) *or* the child being under the legal custody of a local board of social services or child welfare agency (plus additional specified circumstances). Neither of these prerequisites was met in this case. Mother did not agree to voluntarily relinquish the children, nor did the court enter an order transferring custody from mother to the Department.

More importantly, there was no lawful basis for the filing or granting of the petitions to involuntarily terminate mother's residual parental rights because the record includes none of the preconditions for the termination of parental rights under Code § 16.1-283(C)(2): (i) a voluntary relinquishment agreement; (ii) an entrustment agreement; or (iii) commitment. Without one of the listed preconditions, the court cannot lawfully terminate mother's parental rights under Code § 16.1-283(C)(2).

When it was evident that mother was making substantial progress in remedying the conditions that led to the removal of her children, the Department unfairly filed petitions to involuntarily terminate mother's parental rights, violating its mandate to preserve parent-child relationships whenever possible. The Department's failure to strictly comply with the statutory scheme for the constitutionally valid termination of residual parental rights embodied in Code

§ 16.1-283 constitutes an egregious due process violation. The circuit court entered termination orders under Code § 16.1-283(C)(2) without lawful basis, thus violating mother's due process rights.[35] Therefore, on this independent ground, I would reverse the circuit court's termination orders.

### III. The Department Failed to Fulfill Its Duty under Code § 16.1-283(A) to Investigate and Consider Placement with the Children's Adult Brother.

Before removing the children, the Department knew that the children had a pre-existing relationship with their thirty-two-year-old brother, David Frith, and his minor son, L.F. Nonetheless, the Department failed to investigate, consider, and report on Mr. Frith as a possible placement for his siblings before the circuit court ordered the involuntary termination of mother's parental rights. Therefore, the circuit court's presumed finding that the Department satisfied its duty under Code § 16.1-283(A) is without evidence to support it.

### A. The Department's Duty under Code § 16.1-283(A)

Before deciding to terminate a parent's residual parental rights, "the court *shall* give a consideration to granting custody to a person with a legitimate interest." Code § 16.1-283(A) (emphasis added). Code § 16.1-283(A) also "require[s] [*the Department's*] consideration of all "'reasonable options for placement with immediate relatives" *as a prerequisite to a parental termination decision.*'" *Pilenza v. Nelson Cnty. Dep't of Soc. Servs.*, 71 Va. App. 650, 654 (2020) (emphasis added) (quoting *Bagley v. City of Richmond Dep't of Soc. Servs.*, 59 Va. App. 522, 524 (2012) (quoting *Hawthorne v. Smyth Cty. Dep't of Soc. Servs.*, 33 Va. App. 130, 136 (2000))); *see also Sauer v. Franklin County Dep't of Soc. Servs.*, 18 Va. App. 769, 771 (1994)

---

[35] Because mother was not lawfully subjected to the Department's termination petitions in the first place, and because mother was not lawfully required to meet any deadlines under Code § 16.1-283(C)(2), there is no need to consider mother's second assignment of error, which asserts that the circuit court erred by failing to toll the Code § 16.1-283(C)(2) time limit due to the effects of the COVID-19 pandemic and based on the Supreme Court of Virginia orders of judicial emergency.

("Before termination of parental rights by the court, the agency seeking termination has an affirmative duty to investigate all reasonable options for placement with immediate relatives.").

Code § 16.1-283(A) "obligates [the Department] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 567 (2018) (quoting *Brown v. Spotsylvania Dep't of Soc. Servs.*, 43 Va. App. 205, 217 (2004)). "[The Department] had a duty to provide the circuit court with enough information to make an informed determination of whether a relative placement is suitable, and the circuit court had a duty to give appropriate consideration to that information in making its determination." *Id.* at 567-68. The Department has the burden to show that no reasonable alternatives exist to terminating mother's parental rights. *Sauer*, 18 Va. App. at 771.

### B. The Department Failed to Fulfill Its Code § 16.1-283(A) Duty to Produce Sufficient Evidence for the Court to Assess the Suitability of Placement with the Adult Brother.

The Department failed to fulfill its affirmative duty under Code § 16.1-283(A) to investigate and consider placement of the children with their adult brother, and to consider such placement as an alternative to termination of mother's parental rights. Although the Department knew of David Frith and his sibling relationship with the children, the Department failed to provide the circuit court with any information about Mr. Frith before the circuit court terminated mother's parental rights.

During the April 2019 removal process, the Department contacted David Frith to arrange the transportation of T.N. and K.N. from Mr. Frith's home in Cumberland, Kentucky. T.N. and K.N. were visiting Mr. Frith and his son, L.F., for the weekend. L.F. and A.N. are the same age and were best friends. After the removal, the Department did not allow the children to visit with L.F. and David Frith.

When the Department arranged to pick up the children from Mr. Frith's home, Mr. Frith mistakenly thought the Department was returning the children to their mother. The Department never gave Mr. Frith the option of caring for his siblings in lieu of a shelter care placement. Although Mr. Frith testified that he never received any letters from the Department, he eventually contacted the Department and volunteered to take care of his siblings. Rather than investigating Mr. Frith as a placement option and reporting the results of its investigation to the circuit court—as mandated by Code § 16.1-283(A)—the Department inexplicably told Mr. Frith that he would have to start a process on his own and file petitions for custody of his siblings.

Directing Mr. Frith to petition for custody did not satisfy the Department's affirmative duty under Code § 16.1-283(A) to investigate, consider, and report on Mr. Frith as a possible custodian for the children. The Department had no authority to delegate to Mr. Frith its own duty to inform the court that Mr. Frith was a willing placement for his siblings. The Department failed to fulfill its statutory affirmative duty to inform the trial court about Mr. Frith, to provide sufficient information to enable the court to properly consider Mr. Frith as a possible custodian, and to consider placement with Mr. Frith as an alternative to the involuntary termination of mother's parental rights.

The Department's affirmative duty under Code § 16.1-283(A) was not satisfied in this case unless the General Assembly intended the Department to require an interested relative to initiate and assume a litigation position adverse to the parent as a precondition to the trial court's consideration of the relative as a custodian. But the plain language of Code § 16.1-283(A) shows that the Department's view of its statutory duty is incompatible with the General Assembly's legislative intent. Code § 16.1-283(A) mandates that "the court shall give a consideration to granting custody to a person with a legitimate interest." The trial court acted contrary to this mandate by refusing to consider Mr. Frith as a potential custodian merely because he did not

petition for custody.  Notwithstanding the Department's directive, Mr. Frith had no legal

obligation to petition for custody to be considered as a potential custodian for his siblings.  *See*

*Sauer*, 18 Va. App. at 771 ("[R]elatives who may be considered as alternatives [to termination of

parental rights] have no duty to present themselves as such." (quoting *Weaver v. Roanoke Dep't*

*of Human Resources*, 220 Va. 921, 927 (1980))).

Mr. Frith reasonably expected the court to return his siblings to their mother.  As

Mr. Frith explained in his testimony:

> [Mother] deserved them back.  There's such a thing as battered
> wife syndrome. . . .  I lived with Larry; I know what a monster he
> is.  The fact that she was scared, I understand. . . .  I [saw] . . . a
> gun to her head.  She had nowhere to go.  Why would she not
> deserve to get the kids back when she went through that and then
> she's done everything she has done to get them back?  She has a
> house now.  She has everything they need. . . .  Child Protective
> Services was put together to help families get back together, not
> tear them apart.

The circuit court erred in terminating mother's parental rights despite undisputed, unimpeached,

and unrefuted evidence that mother was able and willing to provide proper care and custody for

her children.  *See supra*, section I.  Apart from any consideration of parental fitness, the circuit

court erred in terminating mother's parental rights after the Department failed to comply with its

statutory duty to investigate and produce sufficient information to enable it to consider Mr. Frith

as a custodian for his siblings, and to consider placement with Mr. Frith as an alternative to

termination of mother's parental rights.

This Court's binding caselaw does not support the majority's holding that a relative's testimony at the termination hearing is sufficient to satisfy the Department's affirmative duty under Code § 16.1-283(A).[36]

### i. Brown v. Spotsylvania Department of Social Services

In *Brown*, this Court addressed the appellant's claim that the department failed to adequately consider placement with the grandmother before the court terminated his parental rights. *Brown*, 43 Va. App. at 208, 217-18. Brown argued that the department failed to satisfy its duty under Code § 16.1-283(A) because it failed to conduct a home study of the grandmother's home. *Id.* at 217. We held that Code § 16.1-283(A) does not require the department to conduct a home study. *Id.* at 217-18. The Court reaffirmed that "[the department] is mandated 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" *Id.* at 218 (quoting *Logan v. Fairfax Cnty. Dep't of Human Dev.*, 13 Va. App. 123, 131 (1991)).

Based on the facts in *Brown*, this Court found that the department met the requirements of Code § 16.1-283(A) by questioning Brown about possible placements, investigating Brown's grandmother as a possible placement, investigating Brown's sister as a possible placement, *and informing the court about the facts from its investigation*. *Id.* at 218. Brown told the department that the grandmother "'was not a possibility' due to her age, her work hours, and living

---

[36] The majority's opinion also relies on *Desper v. Shenandoah Valley Dep't of Soc. Servs.*, No. 0634-18-3, slip op. at 8 (Va. Ct. App. Aug. 7, 2018) (finding that the grandmother was non-responsive to DSS's repeated requests that she complete home study documents, and holding that the department's duty under Code § 16.1-283(A) was satisfied when the grandmother testified at the parental termination hearing because "Grandmother's testimony and evidence, along with the testimony and evidence DSS presented, supplied the circuit court with the necessary evidence 'to determine whether there [were] relatives willing and suitable to take custody of [the child], and to consider such relatives in comparison with other placement options'" (first alteration in original) (quoting *Hawthorne*, 33 Va. App. at 138)).

arrangements." *Id.* In *Brown*, we held that the department fulfilled Code § 16.1-283(A) because "DSS presented the facts . . . to the trial court for its consideration in determining the propriety of placing the child with a relative." *Id.* We found that *together with the information provided by the department*, the trial court considered Brown's grandmother's testimony about her suitability and willingness to take custody of the child. *Id.* In *Brown*, we did not hold that the grandmother's testimony at the termination hearing—standing alone—satisfied the department's duty under Code § 16.1-283(A).

### ii. Hawthorne v. Smyth County Department of Social Services

In *Hawthorne*, this Court found that the department did not contact the child's great aunt to consider her as a possible placement, although the department knew of the aunt's relationship to the child. *Hawthorne*, 33 Va. App. at 133-34, 139. Although the aunt did not contact the department, the aunt testified about her availability and suitability as a custodian at the termination hearing. *Id.* This Court did not hold that the aunt's testimony at the termination hearing satisfied the department's duty under Code § 16.1-283(A). Rather, we explicitly re-affirmed *Sauer* and held that the department failed to satisfy its Code § 16.1-283(A) duty.

After finding in *Hawthorne* that the department's duty under Code § 16.1-283(A) was not satisfied as to the child's aunt—despite the aunt's testimony at the termination hearing—we held that the trial court's error was harmless error. In *Hawthorne*, the aunt's testimony in conjunction with the other evidence rendered a department investigation unnecessary because the evidence disqualified the aunt as a suitable custodian for the child. The aunt testified that she wanted custody of the child *only if the child wanted to be with her.* The child's psychologist testified that the child had expressed a preference for placement with his foster mother if he was not returned to his parents. *Id.* at 135. *Given these facts*, a department investigation would be "a

vain and useless undertaking." *Id.* at 139 (quoting *Virginia Passenger & Power Co. v. Fisher*, 104 Va. 121, 129 (1905)).

We concluded in *Hawthorne* that despite the trial court's error in failing to require the Department to investigate and consider the aunt as a placement option, "the purpose underlying Code § 16.1-283(A) was nevertheless met in this case." *Id.* We noted in *Hawthorne* that § 16.1-283(A) requires that the court "'give a consideration to granting custody to the relatives of the child' prior to terminating parental rights . . . ." *Id.* The trial testimony rendered a department investigation unnecessary in *Hawthorne* because "the court had before it all the evidence necessary to consider [the aunt] as a possible custodian." *See also Logan*, 13 Va. App. at 131-32 (finding that the trial court was able to properly decide *not* to grant custody of the child to the grandmother "based on its observations and the facts before it," including information about the grandmother's crowded living situation).

### iii. *Castillo v. Loudoun County Department of Family Services*

In *Castillo*, this Court held that the department satisfied its duty under Code § 16.1-283(A) by researching the children's relatives, preparing a genogram, mailing letters to relatives, supervising relative visitation with the children, conducting interviews with relatives who seemed to be the most likely placement candidates, *and providing the results of its investigation to the court to enable the court to make informed placement decisions*. *Castillo*, 68 Va. App. at 568. In *Castillo*, the Court also noted that the department provided the circuit court with information related to the relatives' housing, medical conditions, strained interactions with the children, and concerning beliefs. *Id.* The Court further noted in *Castillo* that "*the circuit court carefully considered the evidence of DFS's investigation into the relatives for placement*, including trial testimony from several potential relatives, before concluding that none of the relatives would be suitable placements." *Id.* (emphasis added). In *Castillo*, we did not hold that

- 51 -

the relatives' testimony at the termination hearing—standing alone—satisfied the Department's duty under Code § 16.1-283(A).

### C. Harmless Error Analysis

In cases like this where the Department failed to satisfy its duty under Code § 16.1-283(A) to investigate and inform the court about a possible relative placement, the Department's failure to fulfill its duty is harmless error only if (i) "the court had before it all the evidence necessary to consider [the relative] as a possible custodian," *Hawthorne*, 33 Va. App. at 139, *and* (ii) the court "'give[s] a consideration to granting custody to the relatives of the child' prior to terminating parental rights . . .," *id.* Neither of these requirements is met in this case.

In doing a harmless error analysis here, I would hold that the Department's failure to satisfy its affirmative duty under Code § 16.1-283(A) with respect to Mr. Frith is not harmless because (i) the circuit court did not have before it any evidence disqualifying Mr. Frith as a willing and suitable custodian; (ii) the circuit court did not have before it necessary evidence to lawfully grant custody to Mr. Frith; and (iii) the record rebuts the presumption that the circuit court considered granting custody to Mr. Frith.[37]

Taking the evidence in the light most favorable to the Department, the evidence does not support a finding that Mr. Frith is *not* a suitable custodian. Unlike the evidence in *Hawthorne* and *Logan*, the evidence here did not disqualify Mr. Frith as a willing and suitable custodian. According to Mr. Frith's testimony, he was willing to accept custody of his siblings and he was physically, mentally, and financially able to provide proper care and custody. Mr. Frith testified that he resided with his son in a seven-bedroom house, with five bedrooms available for his

---

[37] The following amendment to Code § 16.1-283(A) became effective in July 2021, after the termination hearing in this case: "if custody is not granted to a person with a legitimate interest, the judge shall communicate to the parties the basis for such decision either orally or in writing."

siblings. Although Mr. Frith's income as a factory worker is limited, Mr. Frith testified that he had adequate savings from his prior employment and investments. Mr. Frith's testimony was unimpeached, unrefuted, not inherently incredible, and not inconsistent with the other evidence. *See Cheatham*, 227 Va. at 5. Therefore, even in the light most favorable to the Department, the record shows that Mr. Frith is a potential relative placement.

Based on the evidence here, including Mr. Frith's testimony, it would not have been a pointless exercise to require a department investigation as it would have been in *Hawthorne* and *Logan*. Because the evidence before the circuit court did not enable it to properly decide *not* to grant custody of the children to Mr. Frith, the Department's failure to satisfy its affirmative duty under Code § 16.1-283(A) is not harmless error.

The circuit court did not have before it all the evidence necessary to grant custody to Mr. Frith. On the plain terms of Code § 16.1-283(A1), when the evidence before the court does not disqualify a particular relative, a department investigation of that relative is required before custody can be transferred to that relative. *See* Code § 16.1-283(A1) (transfer of custody to a person with a legitimate interest is authorized only "after an investigation as directed by the court"). The General Assembly clearly did not intend for any trial court to grant custody to a relative based only on the relative's own testimony. Because the evidence before the circuit court did not enable it to lawfully grant custody of the children to Mr. Frith, the Department's failure to satisfy its affirmative duty under Code § 16.1-283(A) is not harmless error.

The Department's failure to satisfy its affirmative duty under Code § 16.1-283(A) is also *not* harmless under the second prong of *Hawthorne*'s harmless error test. Assuming *arguendo* that the circuit court had before it all the evidence necessary to properly consider Mr. Frith as a possible custodian, the Department's failure to satisfy its Code § 16.1-283(A) duty is not harmless error because the circuit court did not consider granting custody to Mr. Frith. Any

presumption that the circuit court considered Mr. Frith as a possible custodian is rebutted by the trial court's statements on the record. During mother's closing argument about the Department's failure to investigate Mr. Frith as a possible custodian, the circuit court interrupted to point out that Mr. Frith had not filed for custody. When the circuit court pronounced its ruling moments later, the court stated, "I can't imagine that I would be returning them to mom, so I'm gonna go ahead and her rights are to be considered terminated . . . ." Based on the record before us, it is evident that the circuit court did not consider granting custody to Mr. Frith as an alternative to terminating mother's parental rights.

Because the Department's failure to satisfy its affirmative duty under Code § 16.1-283(A) was not harmless error, I would reverse the circuit court's termination orders on this independent ground.

### IV. The Evidence Does Not Support the Involuntary Termination of Mother's Parental Rights Under Code § 16.1-283(C)(2).

Before considering whether the evidence is sufficient to satisfy the proof requirements of Code § 16.1-283(C)(2), it is necessary to consider the statutory preconditions for terminating parental rights under Code § 16.1-283(C)(2). By its own terms, this code section is only applicable when the child at issue is "placed in foster care as a result of (i) court commitment, (ii) an entrustment agreement entered into by the parent or parents, or (iii) other voluntary relinquishment by the parent or parents." Code § 16.1-283(C)(2). *See Rader*, 5 Va. App. at 528 (holding that the circuit court's jurisdictional authority to terminate parental rights under Code § 16.1-283(C) requires a prior entrustment agreement or other voluntary relinquishment of custody by the parent, or a valid commitment order transferring custody to the department). Because none of the preconditions for the lawful application of Code § 16.1-283(C)(2) were present here, the circuit court unlawfully terminated mother's parental rights. *See supra*, section II.

Assuming *arguendo* that the JDR court's June 11, 2019 dispositional orders included

commitment orders transferring custody of each child to the Department, I find that the evidence

is insufficient to support the involuntary termination of mother's parental rights under Code

§ 16.1-283(C)(2). *See supra* at n.20. Code § 16.1-283(C)(2) provides:

> The residual parental rights of a parent or parents of a child placed
> in foster care as a result of court commitment, an entrustment
> agreement entered into by the parent or parents or other voluntary
> relinquishment by the parent or parents may be terminated if the
> court finds, based upon clear and convincing evidence, that it is in
> the best interests of the child and that:
>
> . . . .
>
> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed 12 months
> from the date the child was placed in foster care to remedy
> substantially the conditions which led to or required continuation
> of the child's foster care placement, notwithstanding the
> reasonable and appropriate efforts of social, medical, mental health
> or other rehabilitative agencies to such end. . . .

The involuntary termination of residual parental rights under Code § 16.1-283(C)(2) requires

proof by clear and convincing evidence that (1) termination is in the best interests of the child;

(2) "without good cause, the parent . . . has been unwilling or unable within a reasonable period

of time not to exceed twelve months from the date the child was placed in foster care to remedy

substantially the conditions which led to or required continuation of the child's foster care

placement"; and (3) the department or other rehabilitative agencies made reasonable and

appropriate efforts to assist the parent to remedy substantially the conditions which led to or

required continuation of the child's foster care placement.

The circuit court pronounced its judgment on the record and stated the following three

factual findings in support of its decision to involuntarily terminate mother's parental rights:

(1) "[M]other's efforts to try and do what was necessary in order to get the children back in the

home essentially kicked into gear about four months after the termination decision was made by

- 55 -

the J&DR Court"; (2) "I am not belittling mom's situation, being in the home life that they were in. But that ended two years ago and she had 10 months to do something. . . . And in that 10 months up to then, it just hadn't taken place. And [(3)] you failed a drug screen right about the time that they were getting ready to have your hearing."

On appellate review, such express findings of fact are presumed to be correct, and this Court is bound by each such factual finding unless the "finding is plainly wrong or is without credible evidence to support it." *Floyd S. Pike Elec. Contractor, Inc. v. Commissioner, Dep't of Labor & Industry*, 222 Va. 317, 322 (1981). Here, the circuit court's factual findings are without evidence to support them.

The circuit court's factual finding that mother's remedial efforts "kicked into gear" four months after the JDR court's termination decision is without evidence to support it. The Department's own evidence established that by mid-June 2020—four months after the JDR court's termination decision—mother had substantially or completely remedied all three conditions that led to the removal of her children. According to the undisputed, unimpeached evidence, by mid-June 2020 mother's remedial efforts to reunite with her children included the following: mother maintained a suitable home for almost six months, participated in a substance abuse clinic for eight months, substantially abstained from substance abuse for eight months, separated from her abusive husband, participated in a psychological exam, completed moral reconation classes, and completed parenting classes.

Notwithstanding this undisputed, unimpeached evidence showing that mother had substantially or completely remedied all three conditions of removal by June 2020, the Department asked Mr. Adams on re-direct examination whether June 2020 was "when she got serious about trying to get her kids back?" Mr. Adams answered, "That's when she was straightening up, getting better. That's correct." From this characterization of the timing of

mother's "serious" remedial efforts, the circuit court unreasonably inferred that mother's

remedial efforts did not "kick into gear" until June 2020. This inference is unreasonable because

it is contradicted by the Department's uncontradicted evidence of the actual timing of mother's

remedial efforts, showing that mother had substantially or completely remedied the conditions of

removal by June 2020. Although we review the evidence and all reasonable inferences flowing

therefrom in the light most favorable to the Department, we may not consider unreasonable

inferences nor ignore unimpeached, unrefuted evidence supporting mother's position. *See*

*Cheatham*, 227 Va. at 5.

The circuit court's factual finding that mother "had 10 months to do something" is based

on the erroneous assumptions about the beginning and ending dates of the statutory "reasonable

period of time not to exceed 12 months from the date the child was placed in foster care." The

circuit court erroneously assumed that this statutory period began in April 2019, when the

children were removed pursuant to emergency removal orders, and ended in February 2020,

when the JDR court granted the termination petitions. Pursuant to the emergency removal orders

entered on April 16, 2019, the children were "taken into immediate custody and placed in *shelter

care*," as distinguished from *foster care*. *See* Code § 16.1-251(A). Here, the children were not

"placed in foster care" in April 2019 within the meaning of Code § 16.1-283(C). *See supra*,

section II. Even if the children had been "placed in foster care" in April 2019, the circuit court

had no reasonable, non-arbitrary basis for identifying the date of the JDR termination hearing as

the end of the "reasonable period of time" for mother's remediation efforts.[38] It appears that the

circuit court erroneously considered its rulings to be constrained by the time frame of the JDR

---

[38] Given that the court-approved foster care service plans notified mother that the target date for remediation was April 30, 2020, and given that mother made significant progress to remedy the conditions prior to April 30, 2020, the circuit court did not reasonably limit the period for mother's remediation efforts to ten months from the date of the children's removal.

terminations. Since the circuit court termination hearing is *de novo*, the circuit court should have considered the totality of the circumstances in exercising discretion to determine the length of the twelve-month maximum "reasonable period of time" for mother's remediation efforts.[39]

Assuming *arguendo* that the children were "placed in foster care" in April 2019, and that mother had a reasonable period of ten months ending on February 18, 2020 (the date of the JDR termination hearing) to demonstrate her willingness and ability to remedy substantially the conditions that led to the children's foster care placement, the evidence does not support the circuit court's finding that "in that 10 months up to then, it just hadn't taken place." When considering the sufficiency of evidence under Code § 16.1-283(C)(2), the proper inquiry is not whether mother completely remedied the parental unfitness conditions within the allowed period, but whether she "failed to make reasonable progress toward eliminating the conditions" that led to the children's placement in foster care. *Ward v. Commonwealth Dep't of Soc. Servs. for City of Alexandria*, 13 Va. App. 144, 150 (1991). Terminations of parental rights under Code § 16.1-283(C)(2) "hinge . . . on the demonstrated failure of the parent to make reasonable changes." *Toms*, 46 Va. App. at 271.

For a correct sufficiency analysis under Code § 16.1-283(C)(2), it is necessary to refrain from substituting the word "fails" for the phrase "unwilling or unable" and to refrain from substituting the word "remedy" for the phrase "remedy substantially." We presume that the General Assembly carefully chose the words it used in the statute. *Jackson v. Fidelity & Deposit*

---

[39] Assuming *arguendo* that the children were "placed in foster care" on April 16, 2019, the maximum period allowed for mother's remediation efforts under Code § 16.1-283(C)(2) would run from April 16, 2019 to April 16, 2020. The maximum statutory remediation period does not end on the filing date of the termination petitions. To hold otherwise would empower the Department to determine how much time parents are given to make reasonable changes and demonstrate their ability and willingness to substantially remedy the conditions that led to their children's placement in foster care. This would deprive the courts of discretion to determine the length of the "reasonable period of time" under Code § 16.1-283(C)(2) based on the court's consideration of the context and the attendant circumstances.

*Co.*, 269 Va. 303, 313 (2005). "[W]hen different words are used in a statute, each must be given its own meaning if possible." *See Johnson v. Commonwealth*, 53 Va. App. 608, 613 (2009). The General Assembly legislated distinct proof requirements in Code § 16.1-283(C)(1) and (C)(2), which shows that the General Assembly did not intend "fails" to be interchangeable with "has been unwilling or unable." Code § 16.1-283(C)(1) states as follows:

> The parent or parents have, without good cause, *failed* to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship. . . .

The General Assembly's choice not to use the word "failed" in both Code § 16.1-283(C)(1) and (C)(2) manifests a legislative intent to distinguish "failed" from the phrase "has been unwilling or unable."

Taking the evidence in the light most favorable to the Department, the evidence does not support the circuit court's factual finding that mother had been unwilling or unable within ten months from the date the children were placed in foster care to remedy substantially the conditions which led to the child's foster care placement. According to undisputed, unimpeached, and unrefuted evidence, within the ten-month period ending on February 18, 2020 (the date of the JDR termination hearing), mother had substantially or completely remedied the three conditions that purportedly led to the children's placement in foster care: (i) father's domestic violence; (ii) substance abuse; (iii) homelessness.

### A. *The Condition of Father's Domestic Violence*

According to undisputed, unimpeached, and unrefuted evidence, mother separated from her abusive husband in April 2019, and she continuously maintained that separation throughout the ten-month period and beyond. Therefore, the evidence does not support a finding that within

the ten-month period ending on February 18, 2020, mother was unable or unwilling to substantially remedy the condition of her husband's domestic violence.

### B. *The Condition of Substance Abuse*

According to undisputed, unimpeached, and unrefuted evidence, mother participated in a substance abuse clinic from October 2019 through February 18, 2020, and she passed all her drug screens from October 2019 to February 18, 2020. The Department's exhibits and the testimony of Mr. Adams, the Department's caseworker, are the sources of this undisputed evidence. *See supra*, section I. Additionally, there is no evidence to support the circuit court's finding that mother failed a drug screen when "they were getting ready to have [her JDR termination] hearing." Therefore, the evidence does not support the circuit court's finding that within the ten-month period ending on February 18, 2020, mother was unable or unwilling to substantially remedy the condition of substance abuse.

### C. *The Condition of Homelessness*

According to undisputed, unimpeached, and unrefuted evidence, in early-January 2020 the Department confirmed that mother had moved into a three-bedroom apartment. Mr. Adams personally inspected this apartment in early-January 2020, and he reported in writing that it was "adequate in size and condition" but will "need to be completed" with beds and furniture for the children. Based on Mr. Adams' subsequent home visits to this apartment, Mr. Adams testified that "[i]t was appropriate for the kids." Therefore, the evidence does not support a finding that within the ten-month period ending on February 18, 2020, mother was unable or unwilling to substantially remedy the condition of homelessness.

Taking the evidence in the light most favorable to the Department, the evidence does not support the circuit court's finding that mother was unwilling or unable to substantially remedy one or more of the three conditions of parental unfitness that led to her children's purported

"placement in foster care." Therefore, with all due deference to the circuit court's role as fact-finder, I would hold that the factual findings underlying the circuit court's termination orders are without evidence to support them.

If a trial court determines that the evidence fails to prove that a parent was, without good cause, unwilling or unable to substantially remedy the conditions that led to each child's placement in foster care, then the trial court must deny the department's termination petitions regardless of any analysis of the statutory best interests factors.[40]

Assuming *arguendo* that without good cause, mother was—within a reasonable period not to exceed twelve months from the date of the children's purported "placement in foster care"—unwilling or unable to remedy substantially the conditions that led to the children's placement in foster care, the involuntary termination of mother's parental rights is unlawful *unless* the permanent severance of each parent-child relationship is in the best interests of the child. Under a proper construction of Code § 16.1-283(C)(2), the circuit court's determination of each child's present best interests must consider the evidence of mother's remediation efforts after the twelve-month maximum "reasonable period of time" for mother to demonstrate her willingness and ability to substantially remedy the conditions that led to the children's purported placement in foster care. "To temporally restrict the trial court's consideration of the parent-child relationship to the 12-month time limit to remedy conditions that led to foster care would deny the fact finder the opportunity to evaluate the *present* best interests of the child."

---

[40] Although the best interests prong appears first in each of the subsections of Code § 16.1-283, this code section does not dictate an order of analysis with respect to the factors in each subsection. In considering a petition for involuntary termination of parental rights, a court has the discretion to begin its analysis with any prong of Code § 16.1-283(C)(2). By first addressing the "unwilling or unable to remedy substantially" prong, a court may be better able to objectively determine whether that prong is proven, independent of consideration of the best interests factors. If the department fails to meet its evidentiary burden under the second prong of Code § 16.1-283(C)(2), the termination petition fails, and the court's inquiry should end there.

*Bristol*, 64 Va. App. at 47 (emphasis added). *See also Roanoke City Dep't of Soc. Servs. v. Heide*, 35 Va. App. 328, 335 (2001) (rejecting the department's contention "that the statute mandates a twelve month cut-off beyond which a parent's efforts to remedy the conditions are not relevant").

Here, in determining the present best interests of each child, the circuit court erred by limiting its consideration of mother's remediation efforts to the ten-month period after the children were purportedly placed in foster care. The circuit court erroneously ignored the undisputed, unimpeached, and unrefuted evidence that at the time of the circuit court hearing, mother had remedied all three conditions of parental unfitness that led to the removal of her children. *See supra*, section I. Taking the evidence in the light most favorable to the Department, no reasonable fact-finder could find that the conditions of domestic violence, homelessness, or substance abuse currently existed at the time of the circuit court hearing.[41]

The same result follows from applying the provisions of Code § 16.1-283(C)(2) that specify when *prima facie* evidence of a condition of parental unfitness permits an inference that the condition currently exists. When a foster care plan requires a parent to complete a program to address a condition that led to the children's foster care placement, Code § 16.1-283(C)(2) provides that the parent's failure to timely complete the program is *prima facie* evidence that the relevant condition of parental unfitness currently exists. Code § 16.1-283(C)(2) states:

> Proof that the parent . . . *without good cause*, [has] failed or been
> unable to make substantial progress towards elimination of the
> conditions which led to or required continuation of the child's
> foster care placement in accordance with their obligations under
> and within the time limits or goals set forth in a foster care plan
> . . . shall constitute *prima facie* evidence of this condition.

---

[41] In addition to successfully remedying the conditions of unfitness by the time of the circuit court termination hearing, mother had also participated in psychological counseling and completed a psychological exam, moral reconation classes, and parenting classes.

"*Prima facie* evidence is '"evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question *unless rebutted*."'" *Chavez v. Commonwealth*, 69 Va. App. 149, 159 n.1 (2018) (emphasis added) (quoting *Commonwealth v. Dalton*, 11 Va. App. 620, 623 (1991) (quoting *Babbitt v. Miller*, 192 Va. 372, 379-80 (1951))).

In this case, the foster care service plans directed mother to complete moral reconation therapy ("MRT"), and set April 30, 2020 as the target completion date. Mother completed the twelve-class MRT course on June 10, 2020. If the outset of the COVID-19 pandemic was not good cause for the six-week delay in completing the MRT course, then the delay constitutes *prima facie* evidence of the substance abuse condition. Any *prima facie* evidence of the current existence of the substance abuse condition (based on mother's delayed completion of the MRT course) is rebutted by undisputed, unimpeached, and unrefuted evidence that mother had abstained from substance abuse for the twelve consecutive months preceding the circuit court termination hearing. The Department's exhibits and the testimony of Mr. Adams are the sources of this uncontradicted evidence. *See supra*, section I. In view of this evidence, no reasonable fact-finder could infer from mother's delayed completion of the MRT course in June 2020 that the substance abuse condition currently existed at the time of the circuit court termination hearing in April 2021.

Upon a trial court's finding that the prior conditions of parental unfitness do not currently exist, the trial court's determination of each child's best interests is constrained by the constitutionally grounded presumption that the best interests of the child are served by preserving the relationship between a currently fit parent and her children. *See supra*, section I. Under a constitutional construction of Code § 16.1-283(C)(2), if the evidence establishes that the conditions of parental unfitness have been remedied and do not currently exist, then the circuit

court's determination of each child's best interests cannot lawfully be based on a consideration of the statutory best interest factors.

> The general rule that the welfare or interest of the child is of paramount consideration in determining the question of custody . . . is subject to the condition that a fit parent with a suitable home has a right to the custody of his child superior to the rights of others. Here the law presumes that the child's best interest will be served when in the custody of its parent.

*Rocka*, 215 Va. at 518.

Therefore, even assuming *arguendo* that mother did not, within a reasonable period not to exceed twelve months from the date of the children's purported "placement in foster care," demonstrate a willingness and ability to substantially remedy the conditions that led to the purported foster care placement, the evidence that mother had remedied those conditions of parental unfitness at the time of the circuit court hearing legally compels the conclusion that preservation of mother's parental rights is in the best interests of the children. To hold otherwise is to adopt a construction of Code § 16.1-283(C)(2) that is contrary to the legislative intent, including the intent to conform with constitutional due process requirements and to preserve parent-child relationships whenever possible. *See supra*, section I. Therefore, under Code § 16.1-283(C)(2), the circuit court erred as a matter of law when it terminated mother's parental rights despite undisputed, unimpeached, and unrefuted evidence that mother had remedied all the alleged conditions of parental unfitness that led to her children's removal.

For the foregoing reasons, I respectfully dissent.